**APOSTOLIC PENTECOSTAL CHURCH, Plaintiff–Appellee/Cross–Appellant,**

v.

**Clyde L. COLBERT, Sr.; Emanuel Missionary Temple d/b/a C & L Builders, Inc.; and C & L Builders and Investors, Defendants,**

---

**Huntington Banks of Michigan, Intervenor–Appellant/Cross–Appellee.**

Nos. 97–1996, 97–2000.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 8, 1998.

Decided March 3, 1999.

Rehearing and Suggestion for Rehearing
En Banc Denied April 9, 1999.

Joseph Nimako, Cummings, McClorey, Davis & Acho, Livonia, MI, Robert J. Hahn (argued and briefed), Cummings, McClorey, Davis & Acho, P.C., Farmington Hills, MI, for Plaintiff–Appellee/Cross–Appellant.

Hal O. Carroll (briefed), Christian E. Hildebrandt (argued and briefed), Vandeveer & Garzia, Detroit, MI, Edward A. Khoury (briefed), Khoury and Kassab, Birmingham, MI, for Defendants/Intervenor–Appellant/Cross–Appellee.

Before: WELLFORD, BOGGS, and MOORE, Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

Apostolic Pentecostal Church ("Apostolic"), fresh from recovering a judgment against defendants, initiated garnishment proceedings in federal district court. Huntington Banks of Michigan ("Huntington") was in possession of two Certificates of Deposit ("CDs") allegedly owned by defendant Colbert, but failed to disclose the existence of the two accounts when it was served a writ of garnishment by Apostolic. Upon discovering the existence of the two CDs (which had since been cashed out by Colbert), Apostolic sought to recover their value from Huntington. The district court granted partial summary judgment for Apostolic for the value of one of the CDs, but granted Huntington summary judgment regarding the other CD. The court reasoned that Huntington was obligated (but failed) to reveal the existence of one of the CDs (but not the other), and was thus liable for its value. Both Apostolic and Huntington appealed. We affirm both judgments.

## I

On June 7, 1994, plaintiff-appellee Apostolic Pentecostal Church obtained a judgment in the amount of $1,149,810 against defendants Clyde L. Colbert, Sr., Emanuel Missionary Temple ("Emanuel"), and C & L Builders and Investors, in the United States District Court for the Northern District of Illinois. Apostolic properly certified the judgment to the United States District Court for the Eastern District of Michigan on July 21, 1994, and commenced collection proceedings there.

On October 7, 1993, Huntington Banks of Michigan made a mortgage loan of $980,000 to Emanuel. On February 16, 1994, several months before judgment, Colbert wrote a check for $313,000 from the Huntington account of C & L Builders, Inc. to Huntington.[1] Huntington then issued a cashier's check for $313,000 to Colbert the same day in the name of New Birth Apostolic Temple ("NBAT").[2] On May 20, 1994, also before judgment, Colbert opened a checking account at Huntington under the name "New Birth Apostolic Temple," and deposited the $313,000 check.

After judgment, on December 6, 1994, Colbert withdrew $200,000 from the NBAT account, using a withdrawal slip made payable to "Cash." On the slip was written the memo "Purchase Cds." On the same day, Colbert purchased two certificates of deposit from Huntington. The first CD ("the NBAT CD") was for $100,000 and made payable to:

New Birth Apostolic Temple [taxpayer ID number]

Clyde L. Colbert Sr.

The second CD ("the Focus CD") was also for $100,000 and made payable to:

Detroit Community Focus [taxpayer ID number]

Although the Focus CD was endorsed by Colbert, his name did not appear on the face of the CD.

Colbert closed the NBAT account on January 5, 1995. The district court later ruled (with regard to an Apostolic motion for a preliminary injunction) that both of these CD purchases appeared to be fraudulent. It also ruled that Colbert had de facto control over NBAT.

On January 11, 1995, an agent of Apostolic personally served a writ of garnishment on Huntington. The writ sought payment from:

Clyde L. Colbert, Sr., Conducting Business Under Name New Birth Apostolic Temple

Apostolic listed NBAT's Huntington account number on the form.

---

1. Colbert was the sole person authorized to write checks for C & L Builders.

2. Colbert is the "overseer" of NBAT.

On January 19, 1995, Huntington returned a Garnishee Disclosure form to Huntington, indicating that Huntington "is not indebted to defendant for any amount and does not possess or control defendant's property, money, etc." Under the heading "Reason:" on the form, Huntington stated, "Account No.: [NBAT's account number] CLOSED ON 01/05/95." Although Huntington concedes that it was aware of the existence of the NBAT CD, it claims that it had looked at the judgment against defendants that was attached to the writ and, after reading the judgment, came to the conclusion that NBAT was not a judgment debtor. Huntington then notified NBAT about the writ and asked NBAT to confirm that it was a separate legal entity from Colbert. After NBAT provided Huntington with corporate documents soon thereafter, the bank determined that NBAT was not a judgment debtor and, thus, did not mention the NBAT CD in the Garnishee Disclosure form.

On January 23, 1995, the NBAT CD was cashed out by Colbert. Most of the CD proceeds were converted into two cashier's checks (one made out to NBAT, the other to Emanuel); the remaining money (just under $20,000) was applied by Huntington to Emanuel's mortgage. Apostolic, still unaware of the existence of the CDs, issued a subpoena to Huntington on January 27, 1995 that asked Huntington, *inter alia*, for information about any transfer of funds from NBAT's account that had occurred after September 30, 1994. Apostolic first learned of the existence of the NBAT CD in a letter sent from Huntington to Apostolic on April 27, 1995. Colbert cashed out the Focus CD on June 5, 1995.

In proceedings before the trial court, the parties filed a variety of motions. First, the district court granted a motion to intervene by Huntington on March 22, 1995. Second, Apostolic filed a motion to extend time for discovery on August 16, 1995, arguing that it would "be prejudiced if it is not permitted an extension of time to take interrogatories and depositions of Huntington. . . ." The district

court agreed and granted the motion on September 14, 1995. Third, Huntington filed a motion to quash Apostolic's writ of garnishment for insufficiency of process on February 16, 1996; this was ultimately denied by the district court on February 18, 1997.[3]

Finally, and most importantly, Apostolic made a motion for default judgment on February 23, 1996. In the motion, Apostolic sought $200,000 (for the two CDs) pursuant to MICH. CT. R. 3.101(G)(2) (the garnishee liability section of Michigan's garnishment rule), plus monetary sanctions against Huntington's attorneys and attorney's fees. Huntington countered with a motion for summary judgment on May 7, 1997. On May 29, 1997, a magistrate judge issued a report and recommendation that construed Apostolic's motion for default judgment as a motion for summary judgment and granted summary judgment for Apostolic with respect to the NBAT CD, noting that "once the bank discovered the existence of the NBAT CD, it had a duty to disclose its existence." In doing so, he rejected arguments by Huntington that (1) Apostolic had no right to garnish NBAT and (2) under MICH. CT. R. 3.101(M)(2), Apostolic was precluded from challenging the garnishee disclosure because it failed to serve discovery on Huntington within fourteen days of receiving the garnishee disclosure. The magistrate judge, however, recommended granting summary judgment for Huntington on the Focus CD, noting that Colbert's name did not appear on the face of the Focus CD, and was "not persuaded that the garnishment rules require a bank to search for all authorized signatories when it receives a writ of garnishment."

The district court adopted the magistrate judge's report and recommendation in full on July 29, 1997, granting summary judgment for Apostolic on its claim for $100,000 on the NBAT CD, but entering summary judgment for Huntington on Apostolic's claim on the Focus CD. It also denied Apostolic's motions for attorney's fees and sanctions.

Huntington and Apostolic both appeal.

---

**3.** The district court rejected the Report and Recommendation of a magistrate judge recommending that the motion be granted. The district

court held that service complied with state law and was thus proper.

## II

We review de novo the district court's grant of summary judgment. *See McKay v. Toyota Motor Mfg., U.S.A., Inc.,* 110 F.3d 369, 372 (6th Cir.1997). Summary judgment is appropriate when there is no dispute as to a material question of fact and one party is entitled to a judgment as a matter of law. FED.R.CIV.P. 56. We must view all facts and inferences drawn therefrom in the light most favorable to the nonmoving party. *See La-Pointe v. United Autoworkers Local 600,* 8 F.3d 376, 378 (6th Cir.1993). If, after reviewing the record as a whole, a rational factfinder could not find for the nonmoving party, summary judgment is appropriate since there is no genuine issue for trial. *See Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### A. Service of process

■ Huntington's primary argument on appeal is that it was not properly served process, because it was served the writ of garnishment by an agent of Apostolic, not a United States Marshal. FED.R.CIV.P. 69(a) states, in pertinent part:

> Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise. The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution *shall be in accordance with the practice and procedure of the state in which the district court is held,* existing at the time the remedy is sought, *except that any statute of the United States governs to the extent that it is applicable.*

(Emphasis added.) MICH. CT. R. 3.101(F)(1) states:

> The plaintiff shall serve the writ of garnishment, a copy of the writ for the defendant, the disclosure form, and any applicable fees, on the garnishee within 91 days after the date the writ was issued in the manner provided for the service of a summons and complaint in MCR 2.105.

MICH. CT. R. 2.105(D) provides for personal service on a corporation by, *inter alia,* "serving a summons and a copy of the complaint on an officer or the resident agent."

■ Huntington does not dispute Apostolic's contention that service was proper under Michigan law, *i.e.,* in accordance with the practice and procedure of the state in which the district court is held. Rather, it argues that FED.R.CIV.P. 4.1(a) either controls over FED.R.CIV.P. 69(a) or constitutes a "statute of the United States [that] governs to the extent that it is applicable" under Rule 69(a). Rule 4.1(a) states:

> Process other than a summons as provided in Rule 4 or subpoena as provided in Rule 45 shall be served by a United States marshal, a deputy United States marshal, or a person specially appointed for that purpose, who shall make proof of service as provided in Rule 4(*l* ).

However, it is a traditional maxim of interpretation that specific rules control over general rules. *See, e.g., Bulova Watch Co. v. United States,* 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961); *United States v. Paddack,* 825 F.2d 504, 514 (D.C.Cir.1987). If Rule 4.1(a) were to control the "process to enforce a judgment for the payment of money" described in Rule 69(a), Rule 69(a) would be rendered totally meaningless. There would have been no reason for the drafters of the Federal Rules to have created Rule 69(a) if Rule 4.1(a) was intended to cover, under all circumstances, the service of process to enforce a judgment for the payment of money. "Rule 69(a) states that the procedure for service 'shall be in accordance with the practice and procedure of the state in which the district court is held....' Consequently, the manner of service on in-state defendants in such proceedings must be derived ... from the applicable federal or state statute." 4A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1090 (1997) (footnotes omitted).

■ Huntington also contends that Rule 4.1(c) constitutes a "statute of the United States [that] governs to the extent that it is applicable" under Rule 69(a). This argument is equally meritless, not only because it would also render Rule 69(a) meaningless, but also because the Federal Rules are not a statute. They are issued by the Supreme

Court under rulemaking powers delegated by Congress. Although proposed rules may be rejected by Congress, they are usually not affirmatively adopted by the legislature, as all statutes must be. *See Founding Church of Scientology v. Bell,* 603 F.2d 945, 951–52 (D.C.Cir.1979); *see also Senate of Puerto Rico v. United States Dep't of Justice,* 823 F.2d 574, 582 (D.C.Cir.1987) ("rules of procedure promulgated by the Supreme Court generally do not qualify as 'statutes'...."). Further, even if Rule 4.1 were "applicable," so as to provide an alternative means to serve process, it does not, by any terms that "govern," forbid service under state law.

■ Huntington's last contention is that 28 U.S.C. § 566(c) constitutes a "statute of the United States [that] governs to the extent that it is applicable" under Rule 69(a). 28 U.S.C. § 566(c) states:

> Except as otherwise provided by law or Rule of Procedure, the United States Marshals Service shall execute all lawful writs, process, and orders issued under the authority of the United States, and shall command all necessary assistance to execute its duties.

28 U.S.C. § 566(c) is, indeed, an applicable statute. However, it in no way "governs" the service of process of a writ of garnishment under Rule 69, for two reasons. First, 28 U.S.C. § 566(c) states that marshals must execute all writs "[e]xcept as otherwise provided by law or Rule of Procedure...." It would require an absurd interpretation of Rule 69 for this court to hold that a statute which makes a *specific exception* for the Federal Rules of Civil Procedure nonetheless *"governs"* over a Federal Rule. Second, the statute at issue simply describes the "power and duties" of the United States Marshals Service. For example, 28 U.S.C. § 566(a) states that "[i]t is the primary role and mission of the United States Marshals Service to provide for the security and to obey, execute, and enforce all orders of the United States

District Courts, the United States Courts of Appeals and the Court of International Trade." Congress clearly did not intend to create a new rule of civil procedure by passing the statute, which is evidenced by the fact that 28 U.S.C. § 566(c) makes a *specific exception* for the Federal Rules of Civil Procedure.[4]

Following Huntington's tortured interpretation of the Federal Rules would force this court to issue the groundbreaking mandate that all writs of garnishment in this circuit must be served by a United States Marshal. However, we disagree with Huntington's logic. Therefore, since service was "in accordance with the practice and procedure of the state in which the district court is held," service of process on Huntington by Apostolic was proper.

**B. Extension of discovery**

■ Huntington next argues that the district court improperly granted Apostolic's motion to extend the time for discovery, because Michigan's garnishment rule requires that the facts stated in a disclosure statement be taken as true if the plaintiff has not served interrogatories or noticed a deposition of the garnishee within fourteen days of the receipt of the statement.

The court extended discovery pursuant to MICH. CT. R. 3.101(T), entitled "Judicial Discretion," which states that "[o]n motion the court may by order extend the time for ... the plaintiff's filing of written interrogatories...." Huntington claims that this was improper, because MICH. CT. R. 3.101(M)(2) states that

> [t]he facts stated in the disclosure must be accepted as true unless the plaintiff has served interrogatories or noticed a deposition within the time allowed by subrule (L)(1) [fourteen days] or another party has filed a pleading or motion denying the accuracy of the disclosure.

---

**4.** It should be noted that we today expressly reject the reasoning of *United States v. Pauly,* 725 F.Supp. 923, 927 (W.D.Mich.1989). *Pauly* held that "Rule 4(c) and 28 U.S.C. § 566(c) govern service of writs of garnishment ... because subchapter 2.100 of the Michigan Court Rules relates to service of process in general and does

not apply specifically to supplementary proceedings." *Id.* at 927. The district court in the instant case correctly found that *Pauly* was "flatly inconsistent with the clear language of Rule 69(a) and [was] premised upon ... fundamentally flawed conclusions...."

Huntington argues that Rule 3.101(M)(2) is a mandatory rule that required the court to accept the facts in the disclosure as true. At first blush, a reading of the plain language of the rule seems to imply this result. However, Rule 3.101(T) allows the court to "extend the time for . . . the plaintiff's filing of written interrogatories . . . ," which logically implies that the court has the discretion to extend the deadline in Rule 3.101(M)(2). In other words, although Rule 3.101(M)(2) may, in fact, be mandatory, the fourteen-day limit outlined in the rule can apparently be increased at the court's discretion under Rule 3.101(T). Although at *some point in time* the facts in the disclosure must be taken as true, the court appears to have the discretion to alter when, in fact, that point in time occurs.

■ We note that there is simply no prior Michigan court precedent that addresses how to navigate the "intersection" between Rules 3.101(M)(2) and 3.101(T). However, it seems both manifestly absurd and extremely unjust to require a plaintiff to object (via written interrogatories or the noticing of a deposition) to a patently false disclosure statement sent by a garnishee when the plaintiff would have *no reason to believe that the disclosure was patently false.* Rule 3.101(T) was likely enacted in order to give the court the discretion to deal with extreme situations, such as that presented in the instant case. Because the scope of discovery is a matter usually committed to the district court's sound discretion, *see Theunissen v. Matthews,* 935 F.2d 1454, 1465 (6th Cir.1991), we hold that the trial court's decision to extend discovery was not erroneous.

### C. Grant of partial summary judgment for Apostolic

■ Huntington next argues that the district court erred in determining that it should have disclosed the NBAT CD and in entering judgment against it. The magistrate judge's report, which the district court adopted, recommended holding Huntington liable because the bank "should have disclosed the existence of the NBAT CD." Under MICH. CT. R. 3.101(G)(1), a garnishee is liable for "all tangible or intangible property belonging to the defendant in the garnishee's possession or control when the writ is served on the garnishee . . . ." and "all tangible or intangible property of the defendant" that the "garnishee holds by conveyance, transfer, or title that is void as to creditors of the defendant . . . ."[5] MICH. CT. R. 3.101(G)(2) states that "[t]he garnishee is liable for no more than the amount of the unpaid judgment, interest, and costs as stated in the verified statement requesting the writ of garnishment."

We hold that no rational factfinder could find that Huntington properly chose not to disclose the existence of the NBAT CD. On the disclosure form, Huntington indicated that it "does not possess or control defendant's property, money, etc." The bank nonetheless *knew* that it had in its control a CD with defendant Colbert's name on the CD's face. In fact, the bank informed NBAT (which was controlled by Colbert) about the writ of garnishment almost immediately after the writ was served. The magistrate judge properly observed that "[i]t is not the province of the bank to determine whether Plaintiff had a right to garnish an account, or to determine whether the corporate status of its account holder will ultimately defeat the garnishment effort." The grant of summary judgment for Apostolic on the NBAT CD was proper.

### D. Grant of partial summary judgment for Huntington

■ Apostolic claims that the grant of summary judgment for Huntington on its claim to the Focus CD was in error because Huntington failed to disclose the existence of the CD. This argument has no merit, because

---

5. We note that the district court never *explicitly* found that the NBAT CD did "belong" to Colbert or any of his co-defendants. The trial court did, however, explicitly hold that the CD purchases "appeared" fraudulent and that Colbert had de facto control over NBAT. The court clearly believed that the CD was Colbert's property and, moreover, there is overwhelming evidence establishing that the CD was in fact Colbert's property. Therefore, there is no issue of material fact over whether the NBAT CD was "the property of one of the defendants," even though the trial court failed to make this explicit factual finding.

the writ of garnishment served on Huntington indicated that the defendant was "Clyde L. Colbert, Sr., Conducting Business Under Name New Birth Apostolic Temple." Therefore, Huntington's statement (at least as it applies to the Focus CD) that it "is not indebted to defendant [i.e., 'Clyde L. Colbert, Sr., Conducting Business Under Name New Birth Apostolic Temple'] for any amount and does not possess or control defendant's property, money, etc." was truthful. At least as it pertains to the Focus CD, Huntington disclosed everything the writ of garnishment required the bank to disclose, and nothing in MICH. CT. R. 3.101 obligated the bank to do anything more.

### E. Awarding of costs and attorney's fees, and imposition of Rule 11 sanctions

 Apostolic questions the district court's decisions not to impose sanctions on Huntington and to deny Apostolic attorney's fees. Under Michigan law, the decision whether to award attorney's fees is within the trial court's discretion and will be reviewed on appeal for an abuse of discretion. *See Phinney v. Perlmutter,* 222 Mich.App. 513, 564 N.W.2d 532, 557 (1997). Additionally, the appellate standard of review for a district court's Rule 11 determination is also abuse of discretion. *Davis v. Crush,* 862 F.2d 84, 88 (6th Cir.1988). An abuse of discretion exists if the district court based its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence. *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

Apostolic's request for costs and attorney's fees was made pursuant to MICH. CT. R. 3.101(S), which states, in pertinent part:

In addition to other actions permitted by law or these rules, the court may impose costs on a garnishee *whose default or contempt* results in expense to other parties. Costs imposed shall include reasonable attorney fees and shall not be less than $100.

(Emphasis added.)

The magistrate judge recommended the rejection of Apostolic's request under Michigan Rule 3.101(S) by stating that an award of costs and attorney's fees was not appropriate because he had found the bank not "to be in default or in contempt...."[6] This was a correct application of the plain language of the rule, and therefore was not an abuse of discretion.

 We believe, however, that the district court abused its discretion in refusing Apostolic's request for sanctions under FED. R.CIV.P. 11. The court, by adopting the recommendation of the magistrate judge, rejected the request on the grounds that (1) Huntington's conduct was "not unmistakably taken in bad faith" and (2) the bank's legal arguments were not frivolous. In so ruling, it appears that the district court did not inquire specifically into Huntington's conduct in actually *filing* the disclosure with the court. For example, it did not evaluate under Rule 11 whether "the allegations and other factual contentions [in the disclosure] ha[d] evidentiary support or, if specifically so identified, [we]re likely to have evidentiary support after a reasonable opportunity for further investigation or discovery...."

 This was not the proper inquiry under Rule 11. In considering sanctions under the rule, a court inquires into whether the litigant's conduct was *reasonable* under the circumstances. *See Davis,* 862 F.2d at 88. It seems clear that the garnishee disclosure filed by Huntington was a "paper ... signed by the party" under Rule 11(a). Since this "paper" was presented to the court, the district court should have considered, *inter alia,* whether Huntington and its attorneys behaved reasonably in certifying that "the allegations and other factual contentions [in the disclosure] ha[d] evidentiary support or ... [we]re likely to have evidentiary support after a reasonable opportunity for further investigation or discovery," as outlined under Rule 11(b). Since the district court did not even consider the reasonableness of Huntington's conduct as it related to the filing of its garnishee disclosure, we must remand this action to the district court to determine whether Rule 11 sanctions are warranted.

---

**6.** This recommendation was adopted by the district court.

## III

The judgment of the district court, insofar as it failed to impose sanctions on Huntington Banks of Michigan under FED.R.CIV.P. 11, is REVERSED and REMANDED for further proceedings consistent with this opinion. The court's judgment is AFFIRMED in all other respects.