**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0462n.06

**No. 09-2531**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

***Jul 08, 2011***

LEONARD GREEN, Clerk

| | |
|---|---|
| PETER G. GRAIN, M.D.; ANNETTE BARNES, M.D., ) ) ) | |
|     Plaintiffs-Appellants, ) | |
| v. ) ) | On Appeal from the United States District Court for the Eastern District of Michigan |
| TRINITY HEALTH; MERCY HEALTH SERVICES, INC., dba Mercy Hospital-Port Huron; MARY R. TRIMMER; MAHMOUD CHAFTE, M.D., ) ) ) ) | |
|     Defendants-Appellees, ) ) | |
| JERE BALDWIN, M.D.; BERNARD VELARDO, M.D., ) ) ) | |
|     Defendants. ) | |

Before:        BATCHELDER, Chief Judge; BOGGS and WHITE, Circuit Judges.

BOGGS, Circuit Judge. Plaintiffs Peter G. Grain and Annette Barnes filed an eighteen-count complaint against Defendants in 2003. The complaint alleged various contract and civil-rights claims. The contract claims were sent to arbitration, and Plaintiffs prevailed. Plaintiffs then returned to district court to litigate their remaining civil-rights claims, and the district court granted summary judgment in favor of Defendants. We affirm.

No. 09-2531
*Grain, et al. v. Trinity Health, et al.*

I

A

Plaintiffs are husband and wife. Both are African-American doctors—Grain is a neurosurgeon and Barnes a pediatrician. Defendants are Trinity Health, Mercy Health Services, Inc., and Mary R. Trimmer, who is Caucasian.[1] Mercy Health Services, Inc., does business as Mercy Hospital-Port Huron and is an operating unit of Trinity Health. Trimmer was the CEO at Mercy from 1994 to 2003.

Around June 1997, Mercy Hospital decided to recruit Grain, who was working in Fredericksburg, Virginia, at the time, to work as a neurosurgeon in its Port Huron, Michigan, service area. On June 27, 1997, Mercy and Grain entered into the Income Guarantee Agreement ("IGA"). In exchange for Grain agreeing to move his neurosurgery practice to Port Huron, the IGA promised him an annual income of $400,000 for his first two years of practice in Port Huron and $380,000 for the third year. The IGA also contained an arbitration clause.

Grain relocated to Port Huron and began practicing at Mercy on November 3, 1997. Conflict quickly ensued. Shortly after he opened his practice, Mercy complained to Grain about possible performance issues as well as its perception that Grain was not meeting his obligations to build an adequate patient referral base and to see emergency-room patients. After May 1998, Mercy stopped making payments to Grain under the IGA. In July 1998, Mercy told Grain that he was in breach of

---

[1]Also initially named as Defendants were Jere Baldwin, Bernard Velardo, and Mahmoud Chafte. Baldwin and Velardo were dismissed without prejudice by stipulation of the parties on January 27, 2004. Chafte was dismissed by the district court on June 12, 2008, due to his death on May 5, 2004.

the IGA and ordered him to submit a plan of correction. That August, Grain submitted such a plan and, later that month, applied for a renewal of his staff medical privileges.

The renewal process proved to be the source of serious contention. On October 6, 1998, Mercy's Chief of Surgery, Dr. Demashkieh, ordered that Grain be proctored, i.e., that another surgeon be present in the operating room throughout each of Grain's surgeries, and that some of his prior cases be peer reviewed by neurosurgeons at Henry Ford Hospital. Mercy decided to wait to renew Grain's staff medical privileges until after receipt of Henry Ford's peer-review report. On November 10, 1998, the neurosurgeons at Henry Ford completed their peer-review report and concluded that Grain did not need to be personally proctored. The report did, however, suggest that a pre-operation review be required for certain types of surgeries, and Mercy imposed this requirement the following day. Over the next three months, Mercy repeatedly delayed a decision on Grain's medical privileges, citing various concerns with his compliance with the requirements that it had imposed on him. In late January 1999, shortly after Henry Ford Hospital confirmed that Grain had complied with the pre-operation-review requirement, Mercy nonetheless decided to postpone action on Grain's application until February 10, 1999. Significantly, on February 2, 1999, before Mercy made its decision on his medical privileges, Grain signed an agreement that released Mercy from its obligations under the IGA, including Mercy's obligation to pay Grain a guaranteed income for the duration of the IGA. Grain alleges that he signed the release only because he was threatened with a revocation of his medical privileges, which would have ruined his career. On February 10, Mercy extended Grain's medical privileges.

Not surprisingly, Grain eventually decided to leave Mercy, and, in January 2001, he agreed to perform neurosurgery at a hospital in Springfield, Ohio. However, those negotiations broke down after, as Grain alleges, the Springfield hospital contacted Mercy as part of his credentialing process and Dr. Baldwin, the director of the emergency room, made "scathing, malicious and derogatory" comments about him. Appellants' Br. at 18. And so Grain soldiered on at Mercy.

On April 9, 2003, Mercy decided to close permanently its intracranial-surgery program, citing patient safety and financial concerns. The decision followed a vote by the Neurosurgery Task Force to stop the program. Grain alleges that he was invited to serve on the Neurosurgery Task Force but was never notified of the time or place of its meetings. He further alleges that, had he been notified, his vote would have prevented the program from being closed and that, because he performs intracranial surgeries, the closure of the program has caused him to suffer greatly.

B

The procedural history of this case begins on July 26, 2003, when Grain and Barnes filed a sixteen-count complaint in district court. In brief, the complaint alleged:

Count I, racial discrimination under 42 U.S.C. § 1981;

Count II, illegal transfer of patients under 42 U.S.C. § 1395dd(i);

Count III, breach of contract;

Count IV, breach of the implied covenant of good faith and fair dealing;

Count V, misrepresentation;

Count VI, intentional interference with business relations;

Count VII, intentional interference with contractual relations;

Count VIII, libel and slander;

Count IX, civil conspiracy;

Count X, misrepresentation (Barnes);

Count XI, breach of contract (Barnes);

Count XII, interference with business relations (Barnes);

Count XIII, loss of consortium (Barnes);

Count XIV, civil extortion;

Count XV, economic duress; and

Count XVI, rescission of release agreement.

The proceedings below were both lengthy and complicated, nearly to the point of opacity. The issues involved, almost all of which Plaintiffs continue to pursue on appeal, were both numerous and disparate, and they were often pursued simultaneously. Therefore, for the sake of clarity, the procedural history of this case will be presented thematically.

*Early Discovery Disputes*

On September 9, 2003, the district judge filed a pretrial scheduling order. The order required that witness lists be completed by January 31, 2004, discovery be completed by February 28, 2004, and that all motions be filed by March 15, 2004. In stark contrast with this straightforward scheduling order, the record of the entire discovery process abounds with missed deadlines, endless motions, and back-and-forth accusations of bad faith. On appeal, most of the discovery conflicts remain disputed.

Defendants filed their witness list on January 30, 2004, one day prior to the deadline. Plaintiffs filed their witness list on February 2, two days after the deadline, and then a second list of expert witnesses on February 10, 2004, ten days after the deadline. Citing Plaintiffs' untimely witness lists, Defendants filed a motion to strike Plaintiff's expert witnesses.

Plaintiffs had complaints of their own and, on February 25, 2004, filed a motion to compel production of documents and for discovery sanctions against Defendants. Plaintiffs argued that Defendants engaged in dilatory tactics that resulted in over $75,000 in excess legal expenses as well as Plaintiffs' inability to complete all discovery by the February 28, 2004, deadline. At the same time, Plaintiffs filed a motion to amend the scheduling order to extend both the upcoming deadline for discovery as well as the deadline, by then in the past, for finalizing the witness list. Plaintiffs also moved to take additional depositions.

The magistrate judge resolved the discovery disputes in an April 22, 2004, opinion and order that denied Plaintiffs' requests for additional discovery and sanctions and granted Defendants' motion to strike Plaintiffs' untimely witness list. The magistrate judge found that the Plaintiffs had not shown good cause for failing to meet the discovery deadlines. For example, the Plaintiffs conceded that they did not attempt to contact five of the six new expert witnesses until shortly before the witness-list deadline, and, although they were aware of the sixth expert well before the deadline, they chose not to disclose his identity until they filed their ten-day-late list. Plaintiffs filed an objection to the magistrate judge's order. Consistent with the prevailing theme of the proceedings below—argue every single issue to the greatest extent possible—Defendants filed an opposition to

the objection, to which Plaintiffs filed a reply, to which Defendants filed a surreply. The district court did not immediately rule on the objections.

*A New Count*

While those discovery battles raged, Plaintiffs opened a new front on March 12, 2004, with a motion to amend their complaint to make various factual corrections and to add a new Count XVII, a Michigan state-law claim of retaliation for making a racial-discrimination claim. *See* Mich. Comp. Laws. § 37.2701 ("[A] person shall not . . . [r]etaliate . . . against a person because the person has opposed a violation of [the Elliott-Larsen Civil Rights Act], or because the person has . . . filed a complaint . . . under [the] [A]ct."). In their motion, Plaintiffs asserted that none of their proposed changes would require additional discovery. Defendants filed a response.

*Summary Judgment*

On November 7, 2003, Defendants filed a motion for summary judgment, or, in the alternative, to compel arbitration, on Counts III, IV, V, XIV, XV, and XVI, and a motion to compel arbitration on Counts X and XI. Defendants relied primarily on the IGA's arbitration clause and the relevant Michigan statute of limitations. A flurry of lengthy filings followed—*nine* memoranda were filed in the district court on this issue.

*Partial Resolution*

On August 11, 2004, the district judge issued an order that resolved many of the ongoing disputes. The court held that six of Plaintiffs' claims (Counts III, V, X, XI, XIV, and XVI) were subject to arbitration and dismissed those claims. The court dismissed two more claims, Counts IV and XV, as time-barred. The court granted Plaintiffs' motion to amend their complaint to add a

claim of retaliation, Count XVII, and, finally, stayed the entire case pending the resolution of arbitration. The court's written order included an order "that Plaintiffs shall submit an Amended Complaint consistent with this Order." After this order, the claims remaining in the district court action were Counts I (racial discrimination), II (illegal transfer of patients), VI (interference with business relations), VII (interference with contractual relations), VIII (libel and slander), IX (civil conspiracy), XII (interference with Barnes's business relations), XIII (loss of consortium for Barnes), and the putative Count XVII (retaliation for bringing a racial discrimination action).

*Arbitration and Ensuing Litigation*

Forty-five days of arbitration hearings were held from September 11, 2006, to May 24, 2007, and Plaintiffs ultimately prevailed. On December 10, 2007, in full settlement of the six claims submitted to arbitration, Plaintiffs were awarded over $1.6 million. The arbitration panel concluded that Defendants breached the IGA when they stopped payments in June 1998 and wrongfully—although not illegally—coerced Grain to rescind the IGA in February 1999. Not content with this award, Plaintiffs moved the district court on December 22 to increase the arbitration award by over $1.5 million. On February 14, 2008, the district court confirmed the arbitration award and denied Plaintiffs' motion to increase it. Plaintiffs filed a motion for reconsideration, which the district court denied.

Plaintiffs appealed the district court's order insofar and it denied their request to increase the amount of the arbitration award.[2] On December 24, 2008, this court affirmed the district court's

---

[2]Plaintiffs subsequently filed a motion with the district court to stay proceedings pending the resolution of their appeal. The district court denied this motion on June 12, 2008, finding that "[t]he

order, holding that, because Plaintiffs' requested relief went to the merits of the arbitration panel's decision and not to a mathematical error in calculating the award, no form of relief was available to them. *Grain v. Trinity Health*, 551 F.3d 374, 378–80 (6th Cir. 2008), *cert. denied*, 130 S. Ct. 96 (2009).

The arbitration order also led to a separate dispute. Shortly after the district court confirmed the arbitration award, Defendants filed a motion to enforce a provision of the arbitration order that required Plaintiffs to pay certain invoices arising out of the discovery process. During arbitration, Plaintiffs had requested an electronic search of Defendants' computer-backup tapes. The arbitration panel granted the request and ordered Defendants to allow Kroll Ontrack to conduct the search—at Plaintiffs' expense. Although Kroll conducted the search, Plaintiffs failed to pay Kroll the entire $245,769.14 owed.[3] In response, Plaintiffs argued that Kroll failed to conduct the search properly and exceeded the original cost estimate without their approval. The district court determined that the arbitration panel had already considered Plaintiffs' arguments before it issued its order and granted the motion.

---

issues involved in the appeal are wholly unrelated to the litigation of Plaintiffs' [pending] claims . . . ."

[3]Although the cost of the Kroll search appears extravagant, it is a flyspeck compared to the total cost of this litigation. Illustrative is that, as of July 2007—nearly four years ago—Plaintiffs' legal fees and costs totaled nearly $3.5 million. How much Plaintiffs have spent since, and how much Defendants have spent over the past eight years, is not reflected in the record.

*Discovery Disputes Return*

With arbitration out of the way, the parties resumed their discovery disputes. On March 14, 2008, Plaintiffs filed a motion for discovery. Noting that the court had not yet ruled on their objections to the magistrate judge's 2004 discovery order, Plaintiffs requested the additional discovery and schedule modifications that the magistrate judge had denied four years earlier, prior to arbitration. Plaintiffs also detailed the discovery that they sought regarding their two discrimination claims, Counts I and XVII.

On July 8, 2008, the magistrate judge denied Plaintiffs' motion for additional discovery, holding that Plaintiffs were unable to establish good cause to obtain more discovery and upset the magistrate judge's 2004 ruling on the matter. Plaintiffs filed an objection, and, on December 18, 2008, the district court denied Plaintiffs' objections to both the 2004 and the 2008 discovery orders.

*Another New Count*

On July 23, 2008, Plaintiffs filed a second motion to amend their complaint. Although the district court had previously granted their 2004 motion to add a retaliation claim, Plaintiffs requested leave to amend to include both that claim as well as a new Count XVIII, a state-law claim for Defendants' alleged violation of hospital peer-review policy and procedures. *See* Mich. Comp. Laws §§ 331.533, 333.21515, and 333.20175(8). Plaintiffs argued that they did not become aware that Defendants had illegally accessed Grain's peer-review file until the arbitration proceedings, and, because—in their view—the violation was a continuation of Defendants' consistent discrimination against Grain, "the Proposed Amendment will not alter the scope of the case, even if it may present a new issue only discovered during the course of the arbitration proceedings."

On November 6, 2008, the district court denied Plaintiffs' motion to add the new count XVIII. The court held that the amendment would be futile because the Michigan statutes upon which Plaintiffs rely do not create a private right of action and, further, that the peer-review-file policy at issue did not constitute an enforceable contract between Mercy and Plaintiffs. The court also held that Plaintiffs' delay in seeking to add Count VXIII was undue and therefore further justified its decision. Finally, the court noted that it had already granted Plaintiffs' motion to amend their complaint to add the new count XVII, the retaliation claim, and accordingly "s[aw] no reason to address the matter again."

*Second Motion for Summary Judgment: Counts VI and VII*

On May 16 and June 8, 2008, Plaintiffs filed separate motions for summary judgment on Counts VI and VII, Grain's tortious interference claims. Defendants filed separate cross-motions for summary judgment on the claims.

On August 13, 2008, the district court decided the parties' cross-motions for summary judgment on the two counts. The district court granted Defendants' motion for summary judgment on Count VI, the interference with business relations claim, finding that Grain had provided no evidence to support his assertion that it was Mercy's policy to transfer all neurosurgery cases out of Mercy, that Grain did not allege that Defendants had anything to do with the poor recommendation of Grain to the Springfield hospital, and that Grain had no evidence to support the claim that Mercy closed its intracranial-surgery program to drive him from practice. The court also granted Defendants' motion for summary judgment on Count VII, the interference with contractual relations claim, finding that Grain referred only to the IGA in his complaint and that any claim arising out of

Defendants' breach of that contract was time-barred by Michigan's three-year statute of limitations. The district court denied Plaintiffs' motion for reconsideration on October 22, 2008.

*Motion to Disqualify*

On October 8, 2008, Plaintiffs filed a motion to disqualify Richard Seryak, Defendants' counsel, alleging that he acted unethically and illegally during the arbitration proceedings. Specifically, Plaintiffs alleged that Seryak illegally accessed Grain's peer-review file. Both parties filed multiple briefs on the issue, which perhaps demarcate the high point of the parties' flagrant, unprofessional rhetoric towards each other. Although their vitriol does not impact our resolution of the case and will not be addressed further, both parties are cautioned to "think twice about questioning the . . . integrity . . . of opposing counsel," and that "the better practice is usually to lay out the facts and let the court reach its own conclusions." *Big Dipper Entm't, L.L.C. v. City of Warren*, —F.3d—, 2011 WL 1378417, at \*4 (6th Cir. 2011).

On April 15, 2009, the magistrate judge denied Plaintiffs' motion in a 34-page written opinion. The magistrate judge exhaustively recounted the facts at issue and noted that Plaintiffs litigated the same issue during arbitration, lost, and did not seek modification of that aspect of the order in district court when it would have been appropriate to do so. The magistrate judge held both that the arbitration panel's decision on the issue is binding and that, in the alternative, the record does not support Plaintiffs' claim that defense counsel acted unethically or illegally. Plaintiffs filed an objection to the order and Defendants filed a response that requested sanctions against Plaintiffs.

On June 26, 2009, the district judge denied Plaintiffs' objections to the magistrate judge's denial of their motion to disqualify defense counsel. The court concluded that Plaintiffs' objections

had no merit and, pursuant to 28 U.S.C. § 1927, ordered Plaintiffs' counsel to pay Defendants' costs and fees to defend against the motion to disqualify. The district court later considered Defendants' itemization of costs and, after heavily discounting that itemization,[4] ordered Plaintiffs' attorney to pay $26,267.10 to Defendants.

*Third Motion for Summary Judgment: The Remaining Claims*

On July 23, 2009, Defendants filed a motion for summary judgment on Plaintiffs' remaining claims: Counts I, II, VIII, IX, XII, XIII, and XVII. Because Plaintiffs never filed and served an amended complaint that included count XVII, Defendants referred to "Plaintiffs' putative Amended Complaint."

On October 13, 2009, the district court granted Defendants' motion for summary judgment. The district court first noted that Plaintiffs did not address Defendants' arguments regarding Counts VIII, the libel and slander claim, and XII, Barnes's intentional-interference-with-business-relations claim.[5] Accordingly, the court deemed those claims waived.[6] The court next granted summary judgment on Count I, the racial discrimination claim, because the claim, which was based upon racial

---

[4]Defendants' itemization reflected over $90,000 in fees. The district court determined that Plaintiffs should not have to pay for the work of four partners and two associates because one partner and two associates would have been sufficient.

[5]Notably, Plaintiffs also did not include Count VIII in their list of remaining claims in their post-arbitration motion for discovery.

[6]Because Plaintiffs do not address these counts in their initial brief on appeal, to the extent that the district court erroneously considered them waived below, they have been waived here. *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 462 (6th Cir. 2003) ("An appellant waives an issue when he fails to present it in his initial briefs before this court.").

discrimination in relation to Grain's contractual relationship with Mercy, was time-barred because the only contractual relationship that the court found to have existed, the IGA, was terminated more than four years prior to the commencement of the action. The court also granted summary judgment on Count II, the illegal-transfer-of-patients claim, because an element of the claim is that a patient was transferred in unstable condition and there is no evidence in the record that supports this element. The court also rejected Plaintiffs' alternative illegal-transfer argument, that their claim fits into the statute's civil enforcement provision, because Grain alleged only financial harm as a result of the transfer, which is insufficient to meet the "personal harm" requirement of the provision. The court granted summary judgment on Count XI, civil conspiracy, because Plaintiffs lacked evidence, and the court granted summary judgment on putative Count XVII because Plaintiffs never filed an amended complaint and, in the alternative, because Plaintiffs did not establish a connection between Grain's protected activity and Mercy's actions. Because the court concluded that Grain lacked any cognizable claims, it also granted summary judgment on Count XIII, Barnes's loss-of-consortium claim. The district court denied Plaintiffs' motion for reconsideration on November 5, 2009.

Plaintiffs filed a notice of appeal on December 3, 2009. The notice indicates that Grain and Barnes appeal the district court's judgment of October 13, 2009. This court has jurisdiction to review the final judgment of the district court.

II

A

As a threshold matter, Defendants argue that this court lacks jurisdiction to consider Plaintiffs' claim that the district court abused its discretion by ordering sanctions against their counsel. Defendants are correct.

Federal Rule of Appellate Procedure 3(c) requires that the notice of appeal "specify the party or parties taking the appeal by naming each one in the caption or body of the notice . . . ." The general rule, then, is that where a judgment is entered against multiple parties, each party that wishes to appeal the judgment must be named in the notice of appeal. *Maerki v. Wilson*, 128 F.3d 1005, 1007–08 (6th Cir. 1997). However, "this court should not dismiss the appeal of a party whose intent to appeal is made objectively clear by the notice of appeal." *Id.* at 1007 (internal punctuation and citation omitted).

Plaintiffs acknowledge the general rule but argue that, although their counsel's name was not listed in the notice of appeal, their counsel's intent to appeal is otherwise clear because counsel signed the notice of appeal, included the issue in Plaintiffs' Civil Appeal Statement, and discussed the issue at length in Plaintiffs' opening brief on appeal. Reply Br. at 1–3. The plain language of Rule 3(c), however, asks whether a party's intent to appeal is "clear from the *notice*," not from subsequent filings. Fed. R. App. P. 3(c)(4). As this court has explained, the Rule 3 issue commonly arises where sanctions are awarded against an attorney and the relevant jurisdictional question is whether the attorney's "intent to appeal was [ ] objectively clear *on the face of the notice*." *Maerki*, 128 F.3d at 1006–07 (emphasis supplied). Here, although Plaintiffs' counsel signed the notice of

appeal, counsel was not included in the body or caption of the notice and counsel's intent to appeal was not otherwise apparent. Accordingly, we lack jurisdiction to consider Plaintiffs' counsel's appeal of the district court's sanctions against him. *Davis v. Comm'r*, 301 F. App'x 398, 400–01 (6th Cir. 2008) (holding that, where "neither the caption nor the body of the notice of appeal mentions [the attorney], who is not a party to the proceeding" and the attorney "signed the document as *counsel*[,] not as an appellant," the court lacks jurisdiction over any issues concerning the attorney); *Maerki*, 128 F.3d at 1007.

Citing no authority, Plaintiffs alternatively assert that this court has jurisdiction to review the award of sanctions against their attorney because the sanctions order "directly stemmed from the common nucleus of operative facts as the other orders being appealed." Reply Br. at 2, 6–7. That, however, is not the relevant inquiry,[7] and it squarely conflicts both with the holding of *Maerki* and with Rule 3(c).

B

Plaintiffs challenge two discovery orders: first, the denial of Plaintiffs' motion for additional discovery on their racial discrimination claim and putative retaliation claim; and, second, the denial of Plaintiffs' motion to allow expert testimony. This court reviews these discovery orders for an abuse of discretion. *Johnson v. Mitchell*, 585 F.3d 923, 934 (6th Cir. 2009) ("We review . . . a district court's limitation on the scope of discovery . . . for an abuse of discretion."); *United States*

_____

[7]Plaintiffs' language is borrowed from the supplemental-jurisdiction test. *E.g., Harper v. AutoAlliance Intern, Inc.*, 392 F.3d 195, 209 (6th Cir. 2004). Whether or not a federal court could exercise jurisdiction over the *issue*, in and of itself, is not even related to the inquiry of whether the affected *party* has appealed.

*v. White*, 563 F.3d 184, 190 (6th Cir. 2009) (applying abuse-of-discretion standard to issue of allowing untimely designated witnesses).

Plaintiffs rely heavily on this court's decision in *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539 (6th Cir. 2008). *Nance* holds that a prior arbitration, conducted pursuant to a collective-bargaining agreement, of a contractual issue does not bar the plaintiff from re-litigating the same issue, in the context of a federal claim, in federal court. *Id.* at 547–48. Even assuming that *Nance* applies to all arbitrations, even those resulting from individually-bargained contracts such as that at issue here, its holding simply sheds no light on Plaintiffs' discovery arguments. Whether Plaintiffs have the ability to litigate issues, i.e., whether they are precluded, is wholly distinct from the extent of the discovery Plaintiffs are able to conduct on those issues. Not only do Plaintiffs fail to explain how *Nance* could control discovery issues, but their proposed applications of *Nance* lack any coherent guiding principle whatsoever. In Plaintiffs' view—and in complete harmony with their own interests—*Nance* sometimes requires that the district court grant additional discovery *to comply with* an arbitration order and sometimes requires that the district court grant additional discovery *despite* the arbitration panel's order. *Compare* Plaintiffs' Br. at 26, 28 *with* Plaintiffs' Br. at 25, 29. Because *Nance* does not implicate discovery, we reject these arguments.

Plaintiffs first argue that the district court abused its discretion by denying their motion for additional discovery on their racial-discrimination and retaliation claims. When considering whether a district court erred in refusing to grant additional discovery, this court considers "when the moving party learned of the issue that is the subject of discovery, how the discovery would affect the ruling below, the length of the discovery period, whether the moving party was dilatory, and whether the

adverse party was responsive to prior discovery requests." *La Quinta Corp. v. Heartland Properties LLC*, 603 F.3d 327, 334 (6th Cir. 2010) (quoting *Audi AG v. D'Amato*, 469 F.3d 534, 541 (6th Cir. 2006)).

Plaintiffs conducted extensive discovery on Count I from September 23, 2003, until the discovery deadline of February 28, 2004. When they sought to add Count XVII, the retaliation claim, on March 12, 2004, shortly after the end of the discovery period, Plaintiffs stated that the new claim does "not alter the scope of the case nor present new issues for discovery," and that the claim "follows . . . Count I . . . [and] has already been addressed in discovery and conforms with the evidence." Plaintiffs were also allowed even more discovery during arbitration, receiving more than 2,500 additional pages of documents from Defendants and conducting an extensive and costly electronic-database search. Plaintiffs now argue that they should have been granted additional discovery to perfect and expand upon the additional discovery they conducted during arbitration. For example, Plaintiffs seek an additional electronic-database search because they misspelled one of their search terms.[8]

The magistrate judge and the district judge both concluded that Plaintiffs failed to identify any information obtained during arbitration, based on which Plaintiffs sought to discover additional information, "that could earlier not have been anticipated and sought in a timely fashion." On appeal, Plaintiffs continue to argue that they could better support their claims with more discovery,

---

[8]Dr. Rosenblum was spelled Dr. Rosenblem in Plaintiffs' list of search terms. Appellants' Br. at 26. The record suggests that Kroll did not change the spelling according to Plaintiffs' request because Plaintiffs were behind on payments.

but they still provide no explanation for why they failed to conduct their discovery in a timely fashion. Therefore, Plaintiffs fail to demonstrate that the district court clearly erred in denying their motion for additional discovery, and we affirm the district court's order. *John B. v. Goetz*, 531 F. 3d 448, 459 (6th Cir. 2008) ("[T]his court will find an abuse of . . . discretion if left with a definite and firm conviction that the court below committed a clear error of judgment.") (quotation marks and citations omitted).

Plaintiffs also argue that the district court abused its discretion by refusing to allow the testimony of their expert witnesses. It is clear that Plaintiffs were untimely in designating their expert witnesses, and, where a party fails to designate a witness as required by a pre-trial order, the witness may not be used unless the failure to comply "was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). Here, four expert witnesses testified during the arbitration proceeding. After arbitration had concluded, Plaintiffs moved the district court to allow those expert witnesses to testify in the federal action. Although allowing an untimely designated expert may ordinarily not prejudice the opposing party if the expert has previously testified, *see Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 10 (1st Cir. 2001), in this case, the experts testified on different issues during arbitration than they would be asked to testify on in the federal proceedings. *Cf. ibid.* (noting that "there was no meaningful change in the [expert's] testimony"). In their opening brief, Plaintiffs assert that the experts would have given the same opinions and conclusions as they had during arbitration. Appellants' Br. at 28. However, in the context of arguing for the designation of a new expert to replace one that testified during arbitration but was no longer available, Plaintiffs conceded below that the issues addressed during arbitration were different from those at issue in the

remaining claims. Accordingly, the district court did not abuse its discretion is denying Plaintiffs'

motion to allow their untimely designated experts to testify.

C

Plaintiffs also challenge the district court's denial of their motion to disqualify defense

counsel. This court reviews a district court's denial of a motion to disqualify counsel for an abuse

of discretion. *See United States v. Brock*, 501 F.3d 762, 771 (6th Cir. 2007); *Moses v. Sterling

Commerce (Am.), Inc.*, 122 F. App'x 177, 183 (6th Cir. 2005). A district court should not disqualify

an attorney unless, at a minimum, "there is a reasonable possibility that some specifically identifiable

impropriety actually occurred." *Moses*, 122 F. App'x at 183–84 (internal punctuation and citation

omitted).

The facts underlying Plaintiffs' motion are exhausting. A relevant summary, gleaned from

the magistrate judge's thorough factual summary, is as follows.

Mercy maintains a peer-review file on each doctor to whom it has granted staff medical

privileges. The doctor receives a copy of all documents before they are placed in the file and also

has access to the file. Mercy administrators may access the file to make decisions regarding medical

privileges.

During arbitration, Plaintiffs sought to introduce into evidence a peer-review document

relating to Grain's performance as a surgeon. Defendants argued that to do so would waive Grain's

right to preclude the entire file from being admitted into evidence. Plaintiffs withdrew their request

to introduce the document and now argue that the document was from Grain's personal file, not the

peer-review file.

The arbitration panel requested that the parties brief the peer-review issues before it made any decisions. The parties stipulated that neither would remove anything from the file until after the panel's decision.

The next day, Plaintiffs' attorney stated that Grain had reviewed his peer-review file that morning and observed that some documents were missing. Grain alleged that he spoke to Colleen Sampeer, who is in charge of maintaining the file, and that she confirmed that documents had been removed. Defendants' attorney, Richard Seryak, stated that two attorney-client-privilege documents that had been mistakenly added to the file had been removed by Sampeer, as requested by Page Underwood, Trinity's general counsel, prior to Grain's review that morning. Seryak further stated that he had not seen or touched the file.

The arbitration panel reviewed the two documents in question, *in camera*, over Plaintiffs' objection, and ordered that they be placed in sealed envelopes in the file and that the entire file be sealed pending its decision on the issue.

Based entirely on Defendants' removal of the documents, Plaintiffs submitted to the arbitration panel a motion for malice and misconduct, to disqualify Seryak and his law firm from the arbitration proceedings, to report Seryak to the state bar, and to recommend to the district court that Seryak be disqualified and that sanctions be awarded to Plaintiffs. The parties briefed the issue and both Sampeer and Underwood testified before the panel regarding access to the file. Sampeer confirmed that attorney-client-privilege documents had mistakenly been placed in the file and that Seryak had not accessed the file. Both Sampeer and Underwood testified that Underwood had accessed the file—which, as she testified, was standard practice when investigating hospital liability

matters related to treatment quality—prior to arbitration and left a document inside. Grain had

viewed the document and complained to Sampeer about Underwood's access to his file. When

Sampeer notified Underwood, Underwood instructed Sampeer to remove two attorney-client

communications that were in the file. The panel denied Plaintiffs' motion it is entirety.

The arbitration panel ultimately decided that all documents—excluding the attorney-client

communications—in Grain's peer-review file could be used by either party as evidence. Plaintiffs

subsequently introduced the entire file as evidence.

At the December 2, 2008, hearing before the magistrate judge on Plaintiffs' motion to

disqualify, Plaintiffs alleged that Seryak had authored one of the documents placed in Grain's peer-

review file. As evidence, Plaintiffs offered a hearsay statement that one of the arbitrators had told

Grain and Plaintiffs' counsel that Seryak authored the document.

On December 8, 2008, Grain completed an affidavit in which he stated that Seryak had

accessed his peer-review file, again pointing to the hearsay statement of the arbitrator.

The magistrate judge concluded that the arbitration panel's ruling that Seryak did not

improperly access Grain's file is binding and noted that Plaintiffs had an earlier opportunity to move

to vacate or modify the ruling in district court, but they did not do so. The magistrate judge also

considered the issue de novo and found that the record did not support Plaintiffs' allegation that

Seryak had accessed Grain's peer-review file, but rather that Underwood had—lawfully—accessed

the file pursuant to her role as legal advisor and caused the documents to be removed from the file.

Plaintiffs alleged that Defendants had unfairly and unlawfully used documents from the file as

exhibits, but the magistrate judge concluded that those documents had been previously provided to

Plaintiffs during discovery and thus their use did not create surprise or unfair advantage, and, in any case, the documents did not come from the peer-review file. Accordingly, the magistrate judge denied Plaintiffs' motion. The district judge subsequently affirmed the magistrate judge's order on the ground that the motion failed on the merits.

We affirm the district court's denial of Plaintiffs' motion. As the magistrate judge found, there is no evidence that Seryak accessed Grain's file.[9] Although Grain alleged in an affidavit that he recalled seeing Seryak's name on a memorandum in his file, that does not establish that Seryak accessed the file and, to the extent it suggests as much, the magistrate judge was not convinced in light of the other evidence to the contrary. Although Trinity's general counsel accessed the file, Plaintiffs sought disqualification only of Seryak and his law firm. In light of the high bar Plaintiffs must meet to disqualify Seryak, the deference afforded district courts in ruling on motions to disqualify, and the dearth of evidence in Plaintiffs' favor, we conclude that the district court did not abuse its discretion in declining to disqualify defense counsel.[10]

---

[9]On January 21, 2011, Plaintiffs moved this court to allow them to supplement the record with Grain's March 22, 2010, affidavit—his eighth in this action. In the affidavit, Grain states that he opened the sealed envelopes and discovered that the documents inside (presumably the two attorney-client documents) had been removed. He further states that, in his opinion, it would be to Seryak's advantage to have removed the sealed documents, apparently to cover up who authored the memoranda. We deny the motion and, in any case, the additional affidavit does nothing to advance Plaintiffs' legal claims.

[10] We further hold that the district court did not err by not conducting an *in camera* inspection of the documents to determine de novo whether they were, in fact, attorney-client privilege documents. Because there is no evidence to suggest that Seryak accessed the file to either place or remove any documents, the nature of the documents is not relevant to the question of whether Seryak acted illegally.

D

Plaintiffs next challenge the district court's denial of their motion to amend to add Count

XVIII, a claim under Michigan's peer-review statutes.[11]  A court should freely give leave to amend

a complaint "when justice so requires." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 569 (6th Cir.

2003) (quoting Fed. R. Civ. P. 15(a)).  Generally, this court reviews a district court's denial of a

motion for leave to amend a complaint only for an abuse of discretion.  *Yuhasz*, 341 F.3d at 569.

However, this court reviews de novo a denial of leave to amend that is based on the district court's

conclusion that the proposed amendment would be futile.  *Ibid.*  Here, the district court concluded

that, because Michigan's peer-review statutes do not create a private right of action, the proposed

amendment would be futile.  We therefore review the district court's decision de novo.

The peer-review statutes relied upon by Plaintiffs are part of Michigan's Public Health Code.

They provide that peer-review files are confidential and shall be used only for certain enumerated

purposes.  Mich. Comp. Laws §§ 333.20175(8), 333.21513(d), and 333.21515.  Neither these

specific provisions nor the Public Health Code in general explicitly creates a private right of action,

and, under Michigan law, a private right of action can be inferred only where the legislature intended

to create such an action.  *Lash v. City of Traverse City*, 735 N.W.2d 628, 636–37 (Mich. 2007).

Significantly, where a statute provides for remedies, those remedies are exclusive unless "plainly

inadequate."  *Pompey v. Gen. Motors Corp.*, 189 N.W.2d 243, 251 n.14 (Mich. 1971).

---

[11]Plaintiffs additionally argue that "it simply made no sense for the District Court to deny" their request to add Count XVII, the retaliation claim.  Appellants' Br. at 50.  However, the record clearly reflects that the district court granted Plaintiffs' motion to add Count XVII in August 2004. That Plaintiffs never filed an amended complaint is not a failure of the district court.

No. 09-2531
*Grain, et al. v. Trinity Health, et al.*

Applying these principles, Michigan courts have held that the Michigan Public Health Code does not create a private right of action. *Fisher v. W.A. Foote Mem'l Hosp.*, 683 N.W.2d 248, 249–50 (Mich. App. 2004), *review denied*, 703 N.W.2d 434 (Mich. 2005); *Ravikant v. William Beaumount Hosp.*, 2003 WL 22244698, at *5 (Mich. App. 2003). The Code includes a number of remedies, including actions initiated by the state and misdemeanor fines, to enforce its provisions, and, according to Michigan law, those remedies are exclusive. *Fisher*, 683 N.W.2d at 249–50; *see Pompey*, 189 N.W.2d at 251.

In their brief, Plaintiffs cite the Michigan Supreme Court's opinion in *Feyz v. Mercy Memorial Hospital* to support their argument that the peer-review statutes create a private of action. 719 N.W.2d 1, 11 n.45 (Mich. 2006). However, the *Feyz* court explicitly stated that the peer-review statute at issue did not create a private right of action. *Ibid*. The court addressed an exception for malice to statutory immunity granted to hospitals on peer-review issues, holding that malice is only an exception to immunity against an *existing* cause of action and does not create a new, stand-alone cause of action upon which a plaintiff can assert a claim. *Id.* at 11 & n.45. Indeed, contrary to Plaintiffs' assertion, the *Feyz* decision *supports* the district court's holding that the peer-review statutes create no private cause of action.[12]

---

[12]Plaintiffs also suggest that we should certify the issue to the Michigan Supreme Court, *see Lehman Bros. v. Schein*, 416 U.S. 386, 390–91 (1974), but that action is simply unwarranted in this case. The state law is clear: the relevant statutes create no private cause of action. Accordingly, certification to the Michigan courts would be inappropriate. *See ibid*.

- 25 -

Because Plaintiffs' proposed amendment relies on a cause of action that does not exist, we affirm the district court's holding that an amendment would be futile. *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 772–73 (6th Cir. 2005).

III

A

Plaintiffs challenge the district court's entry of summary judgment in favor of Defendants on seven of their claims. This court reviews grants of summary judgment de novo. *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004). Summary judgment is required where, after drawing all inferences in favor of the non-moving party, there is no genuine issue of any material fact and "a rational factfinder could not find for the nonmoving party." *Ibid*. (quoting *Apostolic Pentecostal Church v. Colbert*, 169 F.3d 409, 414 (6th Cir. 1999)); Fed. R. Civ. P. 56(c).

B

Plaintiffs first challenge the district court's grant of summary judgment on Count I, their racial-discrimination claim. In relevant part, 42 U.S.C. § 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." The statute defines the right "to make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id*. § 1981(b). The statute further provides that these rights are protected against interference by both state and private actors. *Id*. § 1981(c); *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006). In order to prevail under the statute, a plaintiff must establish that the defendant intentionally discriminated against him on the basis of race and that

the discriminatory conduct abridged the rights provided for by the statute. *Amini*, 440 F.3d at 358.

The intent element can be proven either by direct evidence or by inference, in which case the

*McDonnell Douglas* burden-shifting framework is employed. *Ibid.*; *see McDonell Douglas v. Green*,

411 U.S. 792 (1973). A four-year statute of limitations applies to claims made pursuant to section

1981. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382–84 (2004); 28 U.S.C. § 1658.

In their complaint filed on June 26, 2003, Plaintiffs alleged that Defendants racially

discriminated against Grain "in the enjoyment of all benefits, privileges, terms, and conditions of his

contractual relationship with Mercy." The district court granted summary judgment in favor of

Defendants because it found that Plaintiffs failed to prove any contractual interference that occurred

within the statutory period. Plaintiffs argue that there is evidence of four instances of contractual

interference, and that all four occurred less than four years before they filed their complaint. We

address each of Plaintiffs' four section 1981 claims in turn.

First, Plaintiffs argue that Defendants discriminated against Grain, in violation of 42 U.S.C.

§ 1981, by coercing him to sign a release from the IGA on February 2, 1999. Appellants' Br. at 33.

The problem, of course, is that February 2, 1999, is more than four years prior to the date Defendants

filed their complaint. Plaintiffs argue that the IGA was supposed to last until June 27, 2000, with

certain covenants to last indefinitely, and that, as a result, Grain continues to suffer the effects of

Defendants' discrimination. *Id*. at 32–33. However, the statute of limitations accrues at "the time

of the *discriminatory act*, not the point at which the *consequences* of the act become painful."

*Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (holding that § 1981 claim accrued when professor was

denied tenure, not when his employment was later terminated in consequence of the denial). Here,

the discriminatory act alleged by Plaintiffs is Defendants' forcing Grain to release them from the

IGA in February 1999. That act occurred more than four years before Plaintiffs filed their complaint

and is time-barred.[13]

Second, Plaintiffs argue that, because Grain had staff medical privileges, he also had a

contractual relationship with Mercy premised on the hospital's medical-staff bylaws. Plaintiffs argue

that the relevant discriminatory act occurred in April 2003—well within the statute of

limitations—when Defendants shuttered the intracranial-surgery program in violation of the bylaws.

Appellants' Br. at 34. However, the bylaws specifically provide that they "shall not constitute a

contract between the medical staff and the hospital." Accordingly, the district court held that the

bylaws created no contract between Grain and Mercy. Plaintiffs cite multiple non-authoritative cases

for the proposition that medical-staff bylaws do create a contract, *e.g., Lim v. Central DuPage Hosp.*,

871 F.2d 644, 647 (7th Cir. 1989), but none of those cases address bylaws that specifically state that

they do *not* constitute a contract; those cases are accordingly inapposite. *Cf. Jimenez v. Wellstar*

*Health Sys.*, 596 F.3d 1304, 1309 (11th Cir. 2010) (holding that, for purposes of § 1981 claim,

medical staff bylaws created no contract between a hospital and a doctor where the bylaws stated that

they conferred no contractual rights). Further, there is a split of authority on the issue of whether

---

[13]Plaintiffs attempt to retain this claim by arguing that it is covered by the continuing-violations doctrine. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). However, the continuing-violations doctrine only provides that a plaintiff can rely on discrete acts that would otherwise be time-barred so long as they are related to independently discriminatory acts that are not time-barred. *Ibid*. Because we hold that Plaintiffs lack a viable discrimination claim premised on any conduct within the statutory period, they cannot rely on the continuing-violations doctrine to resurrect any § 1981 claim related to the IGA.

medical-staff bylaws *ever* constitute a contract, and at least one, albeit unpublished, Michigan case holds that they do not. *Macomb Hosp. Ctr. Med. Staff v. Detroit-Macomb Hosp. Corp.*, 1996 WL 33347517, at *1 (Mich. App. 1996); *Janda v. Madera Community Hosp.*, 16 F. Supp. 2d 1181, 1184–85 (E.D. Cal. 1998) (summarizing cases). Further, the Michigan Supreme Court has held that, where the clear terms of an employment document demonstrate that the employer does not intend to form a contract, no contract exists. *Heurtebise v. Reliable Bus. Computers*, 550 N.W.2d 243, 247 (Mich. 1996). In light of that rule and the bylaws' unambiguous language disavowing the existence of a contract, we hold that the medical-staff bylaws did not constitute a contract between Grain and Mercy and decline Plaintiffs' suggestion that we certify the question to the Michigan Supreme Court.

Third, Plaintiffs argue that Defendants, by closing the intracranial-surgery program, prevented Grain from entering into future contractual relationships with referral sources and third-party payors. Although Plaintiffs do not point to an existing contract that Defendants caused to be broken, section 1981 "protects the would-be contractor along with those who already have made contracts." *Domino's Pizza, Inc., v. McDonald*, 546 U.S. 470, 476 (2006). Accordingly, Plaintiffs need only show that Defendants' intentionally discriminatory actions impaired their rights under a "proposed contractual relationship," such as by preventing them from entering into contracts. *Ibid*. Even assuming that Plaintiffs' affidavits constitute sufficient evidence to create a genuine issue of material fact as to whether Defendants impaired Plaintiffs' proposed contractual relationships, summary judgment in Defendants' favor was nonetheless proper because Plaintiffs fail to create a genuine issue of material fact as to whether Defendants' closure of the intracranial program was a pretext for discrimination.

Defendants claim that they closed the intracranial-surgery program due to concerns about patient safety, the low volume of cases, and financial considerations. Defendants provided evidence that intracranial surgeries constituted only a small portion of the neurosurgies performed at Mercy, and that Grain had performed only seventeen intracranial surgeries during the prior three years. In addition, Defendants provided evidence that nurses had expressed concerns about their ability to ensure the safety of intracranial-surgery patients and that there is a well-understood correlation between the volume of cases and patient safety. Further, Defendants presented evidence that it would cost $250,000 to retrain the nurses and, at the time, Mercy was deep in the red.

To establish pretext, Plaintiffs must show "either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the action], or (3) that [the proffered reasons] were insufficient to motivate the [action]." *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (punctuation and citation omitted). Here, Plaintiffs provide no evidence to refute Defendants' evidence, but rather argue that, despite Defendants' compelling nondiscriminatory reasons—supported by substantial evidence—for closing the program, their true motivation was racial discrimination. In other words, Plaintiffs hang their hat on the second test for pretext: that Defendants' proffered reasons did not actually motivate their closure of the intracranial program. This court has explained that, in order to meet this test, a plaintiff must provide enough circumstantial evidence of discrimination that its "sheer weight" makes it "more likely than not" that the action is pretextual. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The question is whether, "based on the evidence presented, a jury could [ ] reasonably doubt the . . . explanation." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). Here,

Defendants' explanation for their closure of the program is compelling and Plaintiffs' circumstantial evidence of discriminatory intent is thin.[14] Accordingly, Plaintiffs have not created a genuine issue of material fact as to pretext and summary judgment in Defendants' favor was proper.

Fourth and finally, Plaintiffs argue that the illegal use of peer-review material by Dr. Baldwin, the director of Mercy's emergency room, prevented Grain from relocating to the Springfield hospital, and thus interfered with his right to enter into a proposed contract with that hospital. Appellants' Br. at 36–37. The district court, citing no authority, rejected this argument because Baldwin is no longer a defendant.[15] Plaintiffs make no argument, in either their opening brief or their reply brief, as to why Defendants should be held liable for Baldwin's conduct or how the district court may have otherwise erred by rejecting their argument for this reason. This court has held that, for purposes of a section 1981 claim, an employer can be held vicariously liable for one employee's discrimination against another, provided that the discriminating employee is a supervisor with immediate authority over the employee alleging discrimination. *Jackson v. Quanex*

---

[14]Plaintiffs rely primarily on the fact that Mercy's emergency room director, Dr. Baldwin, transferred patients to other hospitals without consulting Grain. Appellants' Br. at 40–41. Due to Defendants' demonstrated safety concerns regarding certain procedures, this transfer of patients hardly refutes or overwhelms their proffered explanation. Further, the ER log demonstrates that many patients were transferred from the ER to Grain himself during the period in question. And, during his deposition, Grain appeared to have an issue with only five out of 117 transfers made from 1997 to 2003. Plaintiffs also point to testimony during arbitration by a Dr. Valjee that, during a discussion with Drs. Grain and Barnes after the closure of the program, Valjee had told them that "maybe if [Grain] was blond and blue eyed, this wouldn't have happened to him." Appellants' Br. at 40. However, Valjee explained his statement by stating that "there was no proof that anybody had said anything racial about it. It was just coming from a background where I've experienced that. It was basically . . . supporting him and sympathizing with him."

[15]Plaintiffs voluntarily dismissed Baldwin on January 24, 2004.

*Corp.*, 191 F.3d 647, 663 (6th Cir. 1999). However, Plaintiffs make no allegations or provide any evidence that Baldwin had supervisory authority over Grain. Further, it does not even appear as though—and Plaintiffs make no allegation to the contrary—Baldwin was even an employee of Mercy at all, but was rather an independent contractor. Appellees' Br. at 12 n.2. Accordingly, this argument, too, fails, and the district court's grant of summary judgment on Count I was proper.

C

Plaintiffs next argue that the district court erroneously granted summary judgment on Count II. Plaintiffs allege that Defendants unlawfully retaliated against Grain for complaining about an illegal transfer of patients, in violation of 42 U.S.C. § 1395dd(i). That statute provides, in relevant part, that a hospital "may not penalize . . . a physician because the . . . physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized . . . ." The district court granted summary judgment in favor of Defendants on this claim because Plaintiffs have not identified any patient transferred from Mercy who had not been stabilized. Plaintiffs do not refute that they have no evidence to establish this element,[16] which they allege nowhere in their complaint, and summary judgment was therefore required. *See* Appellants' Br. at 45–46.

---

[16] In their opening brief, Plaintiffs argue that summary judgment was improper because they did not receive an emergency-room log during discovery. However, they describe the log book only as containing a list of available physicians, so it is therefore not clear how it could prove that any transferred *patients* were unstable. Further, Plaintiffs point to no prior request for discovery on this matter and fail to otherwise explain—or even attempt to explain—how exactly the district judge committed a legal error. Accordingly, the issue merits no further attention. *Garner v. Cuyahoga Juvenile Court*, 554 F.3d 624, 640–41 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

D

Plaintiffs next argue that the district court erred by granting summary judgment in favor of Defendants on Count VI, their interference with business relations claim. In their complaint, Plaintiffs alleged that "[t]he intentional acts of the Defendants . . . undermined Dr. Grain's valid business expectations with prospective patients and were wrongful . . . because said acts were made in bad faith, with malice, with a race based discriminatory animus, and were otherwise improper." To prevail on this claim, Plaintiffs must first demonstrate that they had a valid business relationship or expectancy. *Health Call of Detroit v. Atrium Home & Health Servs.*, 706 N.W.2d 843, 849 (Mich. App. 2005). Second, they must show that Defendants knew about the relationship or expectancy and intentionally interfered with it by committing either a *per se* wrongful act or legal act committed with malice with the purpose of harming the relationship. *Ibid.*; *Feldman v. Green*, 360 N.W.2d 881, 891 (Mich. App. 1984). Finally, Plaintiffs must show that Defendants' interference caused them harm. *Health Call*, 706 N.W.2d at 849. Plaintiffs argue that Defendants' wrongful conduct included coercing Grain to terminate the IGA, closing the intracranial-surgery program, and violating the peer-review statutes. Appellants' Br. at 49. The statute of limitations on the claim is three years. Mich. Comp. Laws § 600.5805(10).

The district court granted summary judgment on Plaintiffs' claim arising out of the IGA because the statute of limitations had expired on that claim. On appeal, Plaintiffs ignore the statute-of-limitations issue and simply reassert that Defendants wrongfully terminated the IGA. In any case, the district court's conclusion was correct because the IGA was terminated more than four years before Plaintiffs filed their action.

The district court next granted summary judgment on Plaintiffs' claim arising out of the closure of the intracranial-surgery program because Plaintiff had not created a genuine issue of material fact as to the wrongfulness of the closure. We agree with the district court. As explained in section III.B, above, Plaintiffs have failed to prove anything beyond a "mere possibility" that Defendants closed the program for any reasons other than those they have stated. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (holding that a "mere possibility" of a factual dispute is insufficient to defeat an opposing motion for summary judgment).

The district court did not address Plaintiffs' claim arising out of Defendants' alleged violations of the Michigan peer-review statutes, and it does not appear as though Plaintiffs argued the issue below. Plaintiffs did reference the peer-review statutes as part of their argument regarding the wrongfulness of Dr. Baldwin's poor recommendation to the Springfield hospital, but they do not raise that conduct in their brief on appeal, which includes only one paragraph of analysis for the entire interference-with-business-relations claim. Accordingly, whether or not the peer-review argument referenced in Plaintiffs' brief is the same as the poor-recommendation argument addressed by the district court, the argument is waived. *Garner*, 554 F.3d at 640–41; *Quirk*, 928 F.2d at 757–58. Accordingly, we affirm the district court's grant of summary judgment on Count VI.

E

Next, Plaintiffs argue that the district court erroneously granted summary judgment on Count VII, their interference-with-contractual-relations claim. Plaintiffs' complaint alleges that "[t]he intentional acts of President Trimmer, Dr. Chafte, Dr. Velardo and Dr. Baldwin resulted in the breach of Mercy's Guarantee Agreement with Dr. Grain and were wrongful or improper in their

means and motives . . . ." Under Michigan law, there is a three-year statute of limitations on actions for intentional interference with contractual relations. Mich. Comp. Laws § 600.5805(10). As previously explained, the allegedly coerced breach of the IGA occurred on February 2, 1999, more than three years prior to the filing of the complaint. Plaintiffs do not address this issue in their brief, but rather assert that "the District Court wrongly insisted that Plaintiffs had to show the existence of an express written contract between Mercy and Dr. Grain." Appellants' Br. at 49. It is not clear to what this assertion is directed, as the district court simply and correctly determined that the conduct Plaintiffs identified in their complaint occurred prior to February 2, 1999, more than three years before Plaintiffs filed their complaint. Accordingly, we affirm.

F

Plaintiffs next argue that the district court erred by granting summary judgment on Count IX, their civil conspiracy claim. Plaintiffs alleged in their complaint that various "members of Mercy's administration combined to accomplish an unlawful purpose, . . . to drive Dr. Grain from his good standing in the medical community and to destroy his medical practice by the use of methods that violate the various statutes and the common law . . . ." To establish a civil conspiracy, Plaintiffs must prove that a combination of two or more people engaged in a concerted action "to accomplish a criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means." *Fenestra Inc. v. Gulf Am. Land Corp.*, 141 N.W.2d 36, 48 (Mich. 1966). Like Plaintiffs' other state-law tort claims, their civil conspiracy claim is subject to a three-year statute of limitations. Mich. Comp. Laws § 600.5805(8); *Mays v. Three Rivers Rubber Corp.*, 352 N.W.2d 339, 340–41 (Mich. App. 1984).

The district court granted summary judgment in favor of Defendants on the civil conspiracy claim because Plaintiffs failed to demonstrate any unlawful or criminal conduct on the part of Defendants. Below, Plaintiffs argued that Defendants' illegal conduct was their violation of 42 U.S.C. § 1981, but, as explained above, that claim fails. Plaintiffs also argued that Defendants unlawfully closed the intracranial-surgery program for the purpose of ending Grain's medical practice, but, as explained above, Plaintiffs cannot demonstrate that Defendants' closure was unlawful. In their appellate brief, Plaintiffs quote some emails from the vice president of Trinity to Trimmer, Mercy's CEO, that relate to Defendants' actions in terminating the IGA, but Plaintiffs do not even begin to explain how those emails demonstrate that any of Defendants' actions were unlawful. Appellants' Br. at 47. Further, a civil-conspiracy claim rooted in the termination of the IGA is barred by the relevant statute of limitations. Therefore, we affirm.

G

Finally, Plaintiffs allege that the district court erroneously granted summary judgment on Count XIII, Barnes's loss-of-consortium claim. Plaintiffs alleged that "Dr. Barnes has suffered a loss of companionship, love, and affection from Dr. Grain as a result of the Defendants' . . . acts and conducts." Under Michigan law, a claim for a loss of consortium "does not arise at all unless the other, impaired spouse has sustained some legally cognizable harm or injury." *Eide v. Kelsey-Hayes Co.*, 427 N.W.2d 488, 489 (Mich. 1988). Accordingly, because the district court properly granted summary judgment in favor of Defendants on all of Plaintiffs' other claims, it properly granted summary judgment on the loss-of-consortium claim.

IV

For the foregoing reasons, we AFFIRM the judgment of the district court.