(Slip Opinion) OCTOBER TERM, 2005 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DOMINO'S PIZZA, INC., ET AL. *v.* McDONALD

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 04–593. Argued December 6, 2005—Decided February 22, 2006

Respondent McDonald, a black man, is sole shareholder and president of JWM Investments, Inc. (JWM). He sued petitioners (collectively Domino's) under 42 U. S. C. §1981, alleging, *inter alia*, that JWM and Domino's had entered into several contracts, that Domino's had broken those contracts because of racial animus toward McDonald, and that the breach had harmed McDonald personally by causing him to suffer monetary damages and damages for emotional injuries. The District Court granted Domino's motion to dismiss on the ground that McDonald could bring no §1981 claim against Domino's because McDonald was party to no contract with Domino's. Reversing, the Ninth Circuit acknowledged that an injury suffered only by the corporation would not permit a shareholder to bring a §1981 action, but concluded that when there are injuries distinct from those of the corporation, a nonparty like McDonald may nonetheless sue under §1981.

*Held:* Consistent with this Court's case law, and as required by the statute's plain text, a plaintiff cannot state a §1981 claim unless he has (or would have) rights under the existing (or proposed) contract that he wishes "to make and enforce." The statute, originally enacted as §1 of the Civil Rights Act of 1866, now protects the equal right of "[a]ll persons" to "make and enforce contracts" without respect to race, §1981(a), and defines "make and enforce contracts" to "includ[e] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits . . . of the contractual relationship," §1981(b). This cannot be read to give McDonald a cause of action because he "made and enforced contracts" for JWM as its agent. The right to "make contracts" protected by the 1866 legislation was not the insignificant right to act as an agent for someone else's contract-

ing, but was rather the right, denied in some States to blacks, to give and receive *contractual rights* on one's own behalf. The statute's text makes this common meaning doubly clear by speaking of the right to "make *and enforce*" contracts. When the 1866 Act was drafted, a mere agent, who had no beneficial interest in a contract he made for his principal, could not generally sue on that contract. Any §1981 claim, therefore, must initially identify an impaired "contractual relationship," §1981(b), under which the plaintiff has rights. McDonald's complaint identifies a contractual relationship between Domino's and JWM, but it is fundamental corporation and agency law that a corporation's shareholder and contracting officer has no rights and is exposed to no liability under the corporation's contracts. McDonald's proposed new test for §1981 standing—whereby any person may sue if he is an "actual target" of discrimination and loses some benefit that would otherwise have inured to him had a contract not been impaired—ignores the explicit statutory requirement that the plaintiff be the "perso[n]" whose "right . . . to make and enforce contracts," §1981(a), was "impair[ed]," §1981(c), on account of race. *Shaare Tefila Congregation* v. *Cobb,* 481 U. S. 615, 618; *Runyon, supra*, at 168; and *Goodman* v. *Lukens Steel Co.,* 482 U. S. 656, 669, distinguished. McDonald's policy argument that many discriminatory acts will go unpunished unless his reading of §1981 prevails goes beyond any expression of congressional intent and would produce satellite litigation of immense scope. Pp. 4–10.

107 Fed. Appx. 18, reversed.

SCALIA, J., delivered the opinion of the Court, in which all other Members joined, except ALITO, J., who took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 04–593

———————

## DOMINO'S PIZZA, INC., ET AL., PETITIONERS *v.* JOHN MCDONALD

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[February 22, 2006]

JUSTICE SCALIA delivered the opinion of the Court.

We decide whether a plaintiff who lacks any rights under an existing contractual relationship with the defendant, and who has not been prevented from entering into such a contractual relationship, may bring suit under Rev. Stat. §1977, 42 U. S. C. §1981.

I

Respondent John McDonald, a black man, is the sole shareholder and president of JWM Investments, Inc. (JWM), a corporation organized under Nevada law. He sued petitioners (collectively Domino's) in the District Court for the District of Nevada, claiming violations of §1981. The allegations of the complaint, which for present purposes we assume to be true, were as follows.

JWM and Domino's entered into several contracts under which JWM was to construct four restaurants in the Las Vegas area, which would be leased to Domino's. After the first restaurant was completed, Domino's agent Debbie Pear refused to execute the estoppel certificates for JWM required by the contracts to facilitate JWM's bank financing. The relationship between the parties further deterio-

rated when Pear persuaded the Las Vegas Valley Water District to change its records to show Domino's, rather than JWM, as the owner of the land JWM had acquired for restaurant construction. McDonald had to go to the Water District to prove JWM's ownership of the land. In the course of what were apparently many and fruitless discussions between McDonald and Pear, McDonald "explained that he intended to see [the contracts] through to completion," even though Pear made clear that unless he agreed to back out of the contractual relationship, he would suffer serious consequences. App. to Pet. for Cert. 12–13. At one point Pear said to McDonald "'I don't like dealing with you people anyway,'" refusing to specify what she meant by "'you people.'" *Id.*, at 13. Pear threatened to use Domino's attorneys to "bury" McDonald if he should sue. *Ibid.* The contracts between Domino's and JWM ultimately remained uncompleted.

At least in part because of the failed contracts, JWM filed for Chapter 11 bankruptcy. The trustee for JWM's bankruptcy estate initiated an adversary proceeding against Domino's for breach of contract. For whatever reason, the trustee chose not to assert a §1981 claim alleging Domino's interference with JWM's right to make and enforce contracts. The breach of contract claim was settled for $45,000, and JWM gave Domino's a complete release. Consequently, no further claims arising out of the same episode could be pursued on JWM's behalf.[1] While the bankruptcy proceedings were still ongoing, McDonald filed the present §1981 claim against Domino's in his personal capacity.

_____

[1] Since JWM settled its claims and is not involved in this case, we have no occasion to determine whether, as a corporation, it *could* have brought suit under §1981. We note, however, that the Courts of Appeals to have considered the issue have concluded that corporations may raise §1981 claims. See, *e.g., Hudson Valley Freedom Theater, Inc.* v. *Heimbach*, 671 F. 2d 702, 706 (CA2 1982).

The gravamen of McDonald's complaint was that Domino's had broken its contracts with JWM because of racial animus toward McDonald, and that the breach had harmed McDonald personally by causing him "to suffer monetary damages and damages for pain and suffering, emotional distress, and humiliation." *Id.*, at 16. The complaint demanded that Domino's discharge its "obligations under the contracts which McDonald would have received, but for the discriminatory practices, including, but not limited to front pay, back pay and other lost benefits," as well as "compensatory damages for pecuniary losses, including pain and suffering, emotional distress, mental anguish, and humiliation," and punitive damages. *Id.*, at 17.

Domino's filed a motion to dismiss the complaint for failure to state a claim. It asserted that McDonald could bring no §1981 claim against Domino's because McDonald was party to no contract with Domino's. The District Court granted the motion. It noted that Domino's had "rel[ied] on the basic proposition that a corporation is a separate legal entity from its stockholders and officers," *id.*, at 6, and concluded that a corporation may have "standing to assert a §1981 claim" but that "a president or sole shareholder may not step into the shoes of the corporation and assert that claim personally." *Id.*, at 7 (citing *Guides, Ltd.* v. *Yarmouth Group Prop. Management, Inc.*, 295 F. 3d 1065, 1072–1073 (CA10 2002)).

The Court of Appeals for the Ninth Circuit reversed. It agreed that an "injury suffered only by the corporation" would not permit a shareholder to bring a §1981 action. 107 Fed. Appx. 18 (2004). But relying on its earlier decision in *Gomez* v. *Alexian Bros. Hospital of San Jose*, 698 F. 2d 1019, 1021–1022 (1983), the Ninth Circuit concluded that when there are "injuries distinct from that of the corporation," a nonparty like McDonald may nonetheless bring suit under §1981. 107 Fed. Appx., at 18–19. The

Court of Appeals acknowledged that this approach set it apart from other Circuits. *Ibid.* We granted certiorari. 544 U. S. 998 (2005).

## II

Among the many statutes that combat racial discrimination, §1981, originally §1 of the Civil Rights Act of 1866, 14 Stat. 27, has a specific function: It protects the equal right of "[a]ll persons within the jurisdiction of the United States" to "make and enforce contracts" without respect to race. 42 U. S. C. §1981(a). The statute currently defines "make and enforce contracts" to "includ[e] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." §1981(b).

McDonald argues that the statute must be read to give him a cause of action because he "made and enforced contracts" for JWM. On his reading of the text, "[i]f Domino's refused to deal with the salesman for a pepperoni manufacturer because the salesman was black, that would violate the section 1981 right of the salesman to make a contract on behalf of his principal." Brief for Respondent 12. We think not. The right to "make contracts" guaranteed by the statute was not the insignificant right to act as an agent for someone else's contracting—any more than it was the insignificant right to act as amanuensis in writing out the agreement, and thus to "make" the contract in that sense. Rather, it was the right—denied in some States to blacks, as it was denied at common law to children—to give and receive *contractual rights* on one's own behalf. Common usage alone is enough to establish this, but the text of the statute makes this common meaning doubly clear by speaking of the right to "make *and enforce*" contracts. When the Civil Rights Act of 1866 was drafted, it was well known that "[i]n general a mere agent, who has no beneficial interest in a contract which he has made on

behalf of his principal, cannot support an action thereon."
1 S. Livermore, A Treatise on the Law of Principal and
Agent 215 (1818).[2]

Any claim brought under §1981, therefore, must ini-
tially identify an impaired "contractual relationship,"
§1981(b), under which the plaintiff has rights.[3]  Such a
contractual relationship need not already exist, because
§1981 protects the would-be contractor along with those
who already have made contracts.  We made this clear in
*Runyon* v. *McCrary,* 427 U. S. 160 (1976), which subjected
defendants to liability under §1981 when, for racially-
motivated reasons, they prevented individuals who "*sought
to enter* into contractual relationships" from doing so, *id.*, at
172 (emphasis added).  We have never retreated from what
should be obvious from reading the text of the statute:
Section 1981 offers relief when racial discrimination blocks
the creation of a contractual relationship, as well as when
racial discrimination impairs an existing contractual rela-

─────────

[2] McDonald's "pepperoni salesman" analogy is imprecise.  It would
better parallel the facts here if the analogy had been to a salesman
unable to collect on accounts receivable because he was black, rather
than to one who was unable to make the contract in the first place.  The
fundamental point, however, is the same: An individual seeking to
make *or* enforce a contract under which he has rights will have a claim
under 42 U. S. C. §1981, while one seeking to make *or* enforce a con-
tract under which someone else has rights will not.

[3] We say "under which the plaintiff has rights" rather than "to which
the plaintiff is a party" because we do not mean to exclude the possibil-
ity that a third-party intended beneficiary of a contract may have rights
under §1981.  See, *e.g.,* 2 Restatement (Second) of Contracts §304, p.
448 (1979) ("A promise in a contract creates a duty in the promisor to
any intended beneficiary to perform the promise, and the intended
beneficiary may enforce the duty").  Neither do we mean to affirm that
possibility.  See, *e.g.*, *Blessing* v. *Freestone,* 520 U. S. 329, 349 (1997)
(SCALIA, J., concurring) ("Until relatively recent times, the third-party
beneficiary was generally regarded as a stranger to the contract, and
could not sue upon it").  The issue is not before us here, McDonald
having made no such claim.

tionship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship.

Absent the requirement that the plaintiff himself must have rights under the contractual relationship, §1981 would become a strange remedial provision designed to fight racial animus in all of its noxious forms, but only if the animus and the hurt it produced were somehow connected to *somebody's* contract. We have never read the statute in this unbounded—or rather, *peculiarly* bounded—way. See, *e.g., Patterson* v. *McLean Credit Union,* 491 U. S. 164, 176 (1989); *Burnett* v. *Grattan,* 468 U. S. 42, 44, n. 2 (1984); *General Building Contractors Assn., Inc.* v. *Pennsylvania,* 458 U. S. 375, 396 (1982).

Nor has Congress indicated that we should. We held in *Patterson* that the prior version of §1981 did "not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." 491 U. S., at 171. In 1991, Congress amended the statute, see 105 Stat. 1071, adding §1981(b), which defines "make and enforce" to bring postformation conduct, including discriminatory termination, within the scope of §1981. See *Jones* v. *R. R. Donnelley & Sons Co.,* 541 U. S. 369, 383 (2004). But while Congress revised *Patterson*'s exclusion of postformation conduct, it let stand *Patterson*'s focus upon contract obligations. In fact, it positively reinforced that element by including in the new §1981(b) reference to a "*contractual relationship.*"

McDonald's complaint does identify a contractual relationship, the one between Domino's and JWM. But it is fundamental corporation and agency law—indeed, it can be said to be the whole purpose of corporation and agency law—that the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts. McDonald now makes light of the law of corporations and of agency—arguing, for instance, that because he "negotiated, signed, performed,

and sought to enforce the contract," Domino's was wrong to "insist that [the contract] somehow was not his 'own.'" Brief for Respondent 4. This novel approach to the law contradicts McDonald's own experience. Domino's filed a proof of claim against JWM during its corporate bankruptcy; it did *not* proceed against McDonald personally. The corporate form and the rules of agency protected his personal assets, even though he "negotiated, signed, performed, and sought to enforce" contracts for JWM. The corporate form and the rules of agency similarly deny him rights under those contracts.

As an alternative to ignoring corporation and agency law, McDonald proposes a new test for §1981 standing: Any person who is an "actual target" of discrimination, and who loses some benefit that would otherwise have inured to him had a contract not been impaired, may bring a suit. Under this theory, an individual is the "actual target" if he was the *reason* a defendant chose to impair its contractual relationship with a third party. McDonald's formulation simply ignores the explicit statutory requirement that the plaintiff be the "perso[n]" whose "right . . . to make and enforce contracts," §1981(a), was "impair[ed]," §1981(c), on account of race. It is just the statutory construction we have always rejected.

McDonald points to several of our prior cases involving plaintiffs whose status as contracting parties was unclear. Because they nonetheless prevailed, McDonald reasons, contractual privity cannot be a *sine qua non* of a §1981 claim. In those cases, however, we did not discuss, much less decide, the privity question. In *Shaare Tefila Congregation* v. *Cobb,* 481 U. S. 615 (1987), we decided the narrow question whether Jews are a separate and protected race under §1982. *Id.*, at 618. Similarly, in *Runyon, supra*, the arguments and the opinion addressed "only two basic questions: whether §1981 prohibits private, commercially operated, nonsectarian schools from denying admission to pro-

spective students because they are Negroes, and, if so, whether that federal law is constitutional as so applied." *Id.*, at 168 (footnote omitted). And in *Goodman* v. *Lukens Steel Co.,* 482 U. S. 656 (1987), we decided only the two contested issues: that §1981 was subject to the state personal injury limitations period, *id.*, at 660–664, and that it violates Title VII of the Civil Rights Act of 1964 and §1981 for a union to decline to press black employees' grievances under the governing collective-bargaining agreement, *id.*, at 669. "The Court often grants certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions, and such assumptions—even on jurisdictional issues—are not binding in future cases that directly raise the questions." *United States* v. *Verdugo-Urquidez,* 494 U. S. 259, 272 (1990) (citations omitted).

McDonald resorts finally to policy arguments. Unless his reading of the statute prevails, he warns, many discriminatory acts will go unpunished. Corporations, for instance, may choose not to bring suit for the racially motivated contract breach. It is not likely to be a common occurrence that the victim of a contract breach will forgo a potent available remedy. Injured parties "usually will be the best proponents of their own rights," *Singleton* v. *Wulff,* 428 U. S. 106, 114 (1976). And if and when "the holders of those rights . . . do not wish to assert them," *id.*, at 113–114, third parties are not normally entitled to step into their shoes. Moreover, §1981 is only one of a multitude of civil rights statutes. Many of McDonald's hypothetical examples of unpunished discrimination would in fact be reachable under Title VII—or even under general criminal law. See, *e.g.,* Brief for Respondent 27 (concerning a scenario in which "Domino's officials had beaten up McDonald in an attempt to intimidate him"). The most important response, however, is that nothing in the text of §1981 suggests that it was meant to provide an omnibus remedy for *all* racial injustice. If so, it would not have

been limited to situations involving contracts. Trying to make it a cure-all not only goes beyond any expression of congressional intent but would produce satellite §1981 litigation of immense scope. McDonald's theory would permit class actions by all the minority employees of the nonbreaching party to a broken contract (or, for that matter, minority employees of any company failing to receive a contract award), alleging that the reason for the breach (or for the refusal to contract) was racial animus against them.

Consistent with our prior case law, and as required by the plain text of the statute, we hold that a plaintiff cannot state a claim under §1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes "to make and enforce." Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's. Because the District Court correctly recognized and applied these principles, the Ninth Circuit erred in reversing its judgment.[4]

*    *    *

The judgment of the Ninth Circuit is accordingly

_____

[4] McDonald also argues in his merits brief (for the first time) that we should affirm the Ninth Circuit's judgment because Domino's interfered with McDonald's own contracts with JWM. Counsel for McDonald asserted at oral argument that this contention is not a new argument (see this Court's Rule 15.2), but is a "sort of formulatio[n] of the same argument" that he had properly raised. Tr. of Oral Arg. 28. As such, it fails for the same reasons that the argument fails in its original incarnation. McDonald acknowledges that JWM did not breach any contractual obligation to him, see Brief for Respondent 44, and so any injury he may have received still derived from impairment of the contractual relationship between JWM and Domino's, under which McDonald has no rights.

*Reversed.*

JUSTICE ALITO took no part in the consideration or decision of this case.