NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0981n.06

No.  12-2616

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Nov 15, 2013

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| LACESHA BRINTLEY, M.D., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| ST. MARY MERCY HOSPITAL; GILBERT ROC, | ) | THE EASTERN DISTRICT OF |
| M.D.; ASIT GOKLI, M.D.; LOUIS HALLAL, M.D., | ) | MICHIGAN |
| TALLAL ZENI, M.D., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

Before:  SUTTON and KETHLEDGE, Circuit Judges; DOW, District Judge. [*]

KETHLEDGE, Circuit Judge.  Dr. LeCesha Brintley cut two of her patient's major blood vessels while performing a routine appendectomy at St. Mary Mercy Hospital.  The patient suffered cardiac arrest and went into a day-long coma.  St. Mary's later revoked Brintley's surgical privileges.  In response, Brintley sued the defendants under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Michigan Elliott-Larsen Civil Rights Act, alleging racial discrimination. The district court granted St. Mary's motion for summary judgment.  We affirm.

---

[*]The Honorable Robert M. Dow, Jr., United States District Judge for the Northern District of Illinois, sitting by designation.

I.

Brintley is an African-American, board-certified surgeon. In October 2006, she applied for medical-staff privileges at St. Mary's. During the application process, Dr. Asit Gokli, the Chief Medical Officer at St. Mary's, discovered that another hospital had suspended Brintley's privileges. Ultimately, however, St. Mary's granted privileges to Brintley at their hospital. St. Mary's later learned that two of Brintley's patients at the other hospital had died from surgical complications.

In January 2008, an otherwise-healthy woman in her early twenties came to St. Mary's with appendicitis. During surgery to remove the woman's appendix, Brintley accidentally cut two of the woman's major blood vessels, sending her into cardiac arrest followed by a day-long coma. The patient needed transfusions of 26 units of blood and did not leave the hospital for 20 days. Later investigation revealed that Dr. Brintley had performed the surgery with a blind-trocar insertion, which is a procedure that prevents the surgeon from seeing the organs and vessels inside the patient's body.

After this surgery, Dr. Gilbert Roc, St. Mary's Chair of Surgery, requested that Brintley remove herself from the emergency-call list. He also told Brintley to stop using the blind-trocar technique. In addition, Roc asked the hospital's Outcomes Department to compare Brintley's rate of surgical complications to that of the other surgeons at St. Mary's. The department found that, in just over a year at St. Mary's, Brintley had six cases that resulted in avoidable surgical complications. The nine surgeons at St. Mary's had only one such complication, total, during that time.

St. Mary's Medical Executive Committee recommended that Brintley undergo a proctorship, during which other surgeons would supervise her surgeries. The committee told Brintley that the proctors would have authority to intervene in the "performance of any case," and that Brintley could not prevent any intervention by a proctor, nor "disregard the proctor's directives or other supervision[.]" Any failure "to strictly abide by all of the requirements and terms" of the proctorship could subject Brintley "to possible summary suspension and other adverse action[.]"

The record shows that Brintley did not abide by the proctorship's requirements. Drs. Roc, Zeni, and Hallal served as Brintley's proctors. Roc once asked Brintley to dim the light so that the surgical team could see the video monitor more clearly. She responded, "I am the surgeon here; I want the OR lights bright." Def. Ex. 23. During another surgery, Zeni had to intervene when, contrary to Roc's directive, Brintley began to perform another blind-trocar insertion. Brintley told Zeni, "You are not here to tell me how to operate." A nurse reported that the disagreement during this surgery "caused tremendous stress on the surgical team" and "great concern for the well being and safety of the patient." Def. Ex. 25.

Zeni and Hallal later withdrew from Brintley's proctorship because of her poor performance and refusal to follow the proctorship's requirements. The Medical Executive Committee thereafter voted to suspend Brintley's surgical privileges. Three levels of internal review confirmed this decision.

Brintley then sued St. Mary's along with Roc, Hallal, Zeni, and Gokli. She alleged racial discrimination in violation of state and federal law, among other claims. St. Mary's filed a motion for summary judgment, which the district court granted on all claims. This appeal followed.

II.

We review de novo the district court's grant of summary judgment. *Shah v. Deaconess Hosp.*, 355 F.3d 496, 498 (6th Cir. 2004).

A.

Brintley argues that the hospital violated Title VII when it revoked her privileges. Title VII protects employees—but not independent contractors—from racial discrimination by an employer. *Id.* at 499. A threshold question here is whether Brintley was an employee of St. Mary's, as opposed to an independent contractor there. "[W]e apply the common law agency test to determine whether a hired party is an independent contractor or an employee." *Id.* at 499. Under that test, we consider among other factors, "the hiring party's right to control the manner and means of" the hired party's performance, the skill required by the hired party, "the tax treatment of the hired party's compensation[,]" and whether the hired party is "in business for himself." *See id.* at 499–500 (internal quotation marks omitted).

The factors here point uniformly towards an independent-contractor relationship. Here, until the botched appendectomy in January 2008, Brintley controlled all aspects of her surgeries. Brintley ran her own business, entitled "L. Brintley, MD, PLC," and held privileges at other facilities, where she treated patients without any control from St. Mary's. And surgery obviously requires a high level of skill. In addition, St. Mary's did not pay Brintley a salary or prepare a W-2 for her. Brintley herself never filed tax returns as an employee of St. Mary's. Instead, she billed her patients directly and paid her own malpractice insurance, health insurance, and licensing fees. Thus, we

conclude, as a matter of law, that Brintley was not an employee of St. Mary's. *See Shah*, 355 F.3d

at 500. Her Title VII claim therefore fails.

B.

Brintley next argues that the hospital violated 42 U.S.C. § 1981 when it revoked her

privileges. Section 1981 "protects the equal right of all persons . . . to make and enforce contracts

without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (punctuation

omitted). To proceed with this claim, however, Brintley must first show the existence of a contract

between her and St. Mary's. *Id.* at 476.

Brintley contends that St. Mary's bylaws created such a contract. But she does not explain

which of the bylaws' provisions create a contract with her, much less how any provision does so.

And the bylaws themselves appear primarily, if not exclusively, to describe St. Mary's self-

governance and organization. Nothing in them speaks to or creates a contractual relationship with

Brintley.

Brintley responds that, under *Grain v. Trinity Health*, 431 F. App'x 434 (6th Cir. 2011),

hospital bylaws create a contract unless they expressly state otherwise. In *Grain*, the bylaws

specifically provided that they did "not constitute a contract between the medical staff and the

hospital." 431 F.App'x at 450. But in *Grain* we did not say that, absent such language, a hospital's

bylaws do create such a contract. Instead we noted there is Michigan caselaw to the contrary. *See*

*id.* (citing *Macomb Hosp. Ctr. Med. Staff v. Detroit-Macomb Hosp. Corp.*, 1996 WL 3347517, at

*1 (Mich. Ct. App. 1996)). *See also Abu-Farha v. Providence Hosp.*, 2002 WL 1308778, at *3 (Mich. Ct. App. 2002).

St. Mary's bylaws thus do not create a contract with Brintley, and she otherwise does not have any contract with St. Mary's to serve as the predicate for her § 1981 claim. Her § 1981 claim therefore fails.

C.

Brintley's claim under Michigan's Elliot-Larsen Act remains. The Act prohibits racial discrimination with respect to employment or access to public accommodations. Mich. Comp. Laws Ann. § 37.2202. Here, Brintley lacks any direct evidence that St. Mary's discriminated against her on the basis of her race. Thus, she must present evidence "from which a factfinder could infer that [she] was the victim of unlawful discrimination." *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001) (emphasis deleted). To do so, Brintley must present evidence that the hospital treated her differently than "similarly-situated employees" who were not African-American. *See Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916–17 (6th Cir. 2013).

To that end, Brintley alleges that St. Mary's imposed less restrictive proctorships upon two Caucasian doctors than it imposed upon her. But neither of the other two doctors had the history of serious complications that Brintley did. Thus, neither of them are similarly situated to Brintley, and her Elliot-Larsen claim therefore fails. *Id.*

The district court's grant of summary judgment is affirmed.