**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

——————

No. 19-10006

——————

United States Court of Appeals
Fifth Circuit

**FILED**

January 15, 2020

Lyle W. Cayce
Clerk

WHITE GLOVE STAFFING, INCORPORATED,

        Plaintiff - Appellant

v.

METHODIST HOSPITALS OF DALLAS; DALLAS METHODIST
HOSPITALS FOUNDATION, INCORPORATED,

        Defendants - Appellees

——————————

Appeal from the United States District Court
for the Northern District of Texas

——————————

Before OWEN, Chief Judge, and HAYNES and COSTA, Circuit Judges.

HAYNES, Circuit Judge:

      Appellant White Glove Staffing, Inc. ("White Glove") appeals the district court's dismissal of its 42 U.S.C. § 1981 racial discrimination claim and grant of summary judgment on its § 1981 retaliation claim. We REVERSE the district court's dismissal of White Glove's racial discrimination claim, AFFIRM the district court's grant of summary judgment on White Glove's retaliation claim, and REMAND the case for proceedings consistent with our opinion.

## I.   Background

      White Glove is a staffing corporation that provides clients with temporary kitchen and food service personnel. Appellees Methodist Hospitals

of Dallas and Dallas Methodist Hospitals Foundation, Inc. (collectively, "Methodist" or the "Hospital") own and operate multiple hospitals in the Dallas–Fort Worth area.

In May 2016, White Glove employees Michael White, Shawn White, and Pedro Gutierrez met with Methodist chef Jose Soto to discuss whether White Glove could provide the Hospital with temporary kitchen staff. The same White Glove employees later met with Jeff Jennings, Methodist's catering coordinator. Jennings said that Methodist "wanted to give [White Glove] a shot" at providing temporary staff and that White Glove "ha[d] the contract."

Shawn and Gutierrez met with Jennings again the next day. Linda White, the founder and owner of White Glove, was also present. At the meeting, Jennings allegedly stated that Soto "only really want[ed] to work with Hispanics" and that Soto "preferred Hispanics" over other groups. Additionally, Gutierrez said Soto told him to "[s]end [him] some compadres," which Gutierrez interpreted as "meaning send Mexican people, Hispanic people."

Though White Glove and Methodist had not yet reached a formal agreement, Methodist asked White Glove to begin providing it with kitchen staff. On Thursday, May 19, White Glove sent Carolyn Clay, an African-American woman, to work in the Hospital's kitchen as a prep cook. Clay returned to work without issue the following Friday and Saturday. But during Clay's Saturday shift, the only other African-American working in the kitchen allegedly told her, "I'm surprised you're in here. They usually don't let blacks in this kitchen." The employee said that she was working there "only because" she had been there for eighteen years.

Clay returned to work the following Monday and finished her shift without incident. But afterwards, a "very upset" Jennings told Shawn that Soto "was not happy because he wanted only Hispanics. That's what Chef

wanted. . . . I don't want anybody else out here. . . . We went over this. I don't know why you're sending out other people."

Shawn responded, "that's kind of messed up, I mean for you to tell me that this is exactly all you're wanting." He continued: "I have a lot of people of all different backgrounds, so if you're needing someone else tomorrow . . . I'll do what I can to try and put someone else in that spot. . . ." But he cautioned that "being as it's so late in the day, and [that the company needs someone] so early tomorrow, I'm not sure if I can get you anyone else. And, you know, [Clay] is already familiar with the kitchen." Shawn claimed that Jennings "wasn't too happy" about the conversation.

White Glove did not have a Hispanic staffer to send to Methodist the next morning, so it again sent Clay to the Hospital. Three hours after Clay arrived, a junior chef told her to leave because "[w]e don't need you anymore today." A "clearly upset" Jennings then called Linda, stating that Soto "didn't want to use [White Glove] anymore because he was mad about [Clay] because she wasn't Hispanic." Michael said that Jennings "wanted to cancel everything" and indicated that "the whole deal was off."

When Linda asked Jennings "if that was the only reason" for the termination, Jennings reiterated Soto's displeasure at being sent a non-Hispanic worker. Linda responded, "That's a little hard to say out loud sometimes, isn't it, Jeff?" Jennings said, "Yeah, it is. But it is what it is."

Linda asked Jennings for another opportunity to work out an agreement with Methodist. Though Jennings initially agreed to meet, he called back several minutes later and said there would be no follow-up meeting: he "was going to go with what [Soto] wanted." White Glove did not work with Methodist after that day.

White Glove and Clay sued Methodist in May 2017, alleging violations of § 1981 and Title VII, among other claims. Methodist moved to dismiss White

No. 19-10006

Glove's § 1981 racial discrimination claim under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion, concluding that White Glove lacked standing to assert a discrimination claim because it was a corporation without a racial identity. Methodist also moved for summary judgment on White Glove's § 1981 retaliation claim. The district court granted Methodist's motion. This appeal followed.

## II.     Standard of Review

We review a district court's Rule 12(b)(6) dismissal de novo, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff[]." *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (en banc) (internal quotation marks and citation omitted). We also review a district court's grant of summary judgment de novo, interpreting all facts and drawing all reasonable inferences in favor of the non-movant. *Zastrow v. Hous. Auto Imps. Greenway Ltd.*, 789 F.3d 553, 559–60 (5th Cir. 2015).

## III.     Discussion

White Glove appeals the district court's dismissal of its § 1981 racial discrimination claim on standing grounds. White Glove also appeals the district court's grant of summary judgment on its § 1981 retaliation claim. We address each issue in turn.

### A. Statutory Standing

Methodist argues that White Glove lacks standing to bring a § 1981 discrimination claim. We hold that White Glove does in fact have standing to assert its claim.

Methodist first argues that White Glove lacks standing to assert a § 1981 claim because it does not have a minority racial identity. The Supreme Court has never decided whether a corporation can assert a § 1981 discrimination claim. It has stated in a Fourteenth Amendment housing case that "a

4

corporation . . . has no racial identity and cannot be the direct target of . . . discrimination." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263 (1977). But this language was not necessary to the Court's ruling in that case because it found that another party had standing.[1] *See Carnell Const. Corp. v. Danville Redev. & Hous. Auth.*, 745 F.3d 703, 715 (4th Cir. 2014) ("[T]he quoted language from *Arlington Heights* was surplusage unrelated to the Court's determination of the standing issue presented."); *see also Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 704 (2d Cir. 1982) ("[T]he sentence was of only academic importance and we do not believe that the Supreme Court would slavishly apply it so as to deny [the plaintiff] its day in court."). More importantly, *Arlington Heights* did not address standing under a statute; instead, it limited its holding to the plaintiffs' Fourteenth Amendment claim. 429 U.S. at 271. The Supreme Court has never addressed corporate standing for § 1981 racial discrimination claims, and we have never held that constitutional discussion in *Arlington Heights* forecloses corporate standing in this statutory context.

Indeed, several of our sister circuits have held that a corporation may assert § 1981 claims. *See Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1060 (9th Cir. 2004) ("[I]f a corporation either suffers discrimination harm cognizable under § 1981, or has acquired an imputed racial identity, it is sufficiently within the statutory zone of interest to have prudential standing to bring an action under § 1981.").[2] We have also

---

[1] The *Arlington Heights* Court did not decide whether the corporate plaintiff had standing to assert claims on behalf of other individuals because an individual plaintiff had standing to do so. *Id.* at 263–64.

[2] *See also Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 473 n.1 (2006) ("[T]he Courts of Appeals to have considered the issue have concluded that corporations may raise § 1981 claims."); *McClain v. Avis Rent A Car Sys., Inc.*, 648 F. App'x 218, 222 n.4 (3d Cir. 2016) (concluding that a corporate plaintiff had "statutory standing under § 1981 based on the theory that the corporation was discriminated against due to the race of its owner and

permitted a corporation to assert a § 1981 claim without addressing standing. *See Body By Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017) (holding that the plaintiff company had adequately alleged that it was a racial minority because it was "a '100% African American-owned body shop'").

White Glove is not minority-owned. Methodist argues that because White Glove lacks an imputed racial identity, it necessarily lacks standing to assert a § 1981 discrimination claim. But Methodist overreads existing precedent. The circuit decisions holding that corporations with imputed racial identities may assert § 1981 claims do not mean that a corporation *must* have a racial identity to assert such a claim.

In *Gersman v. Group Health Ass'n*, the D.C. Circuit concluded that "the determination whether a corporation has a racial identity is not determinative of whether that corporation has standing to bring a discrimination claim." 931 F.2d 1565, 1568 (D.C. Cir. 1991), *vacated on other grounds*, 502 U.S. 1068 (1992) (vacating and remanding for reconsideration in light of the Civil Rights Act of 1991), *aff'd on reh'g*, 975 F.2d 886 (D.C. Cir. 1992). There, corporate plaintiff CSI alleged that defendant GHA had terminated its contractual relationship with CSI because CSI's shareholders were Jewish. *Id.* at 1567. The D.C. Circuit held that CSI had standing to assert a § 1981 discrimination claim. *Id.* at 1569–70.

---

main operator"); *Carnell*, 745 F.3d at 715 ("We hold that a corporation that is minority-owned and has been properly certified as such under applicable law can be the direct object of discriminatory action and establish standing to bring an action based on such discrimination."); *Heimbach*, 671 F.2d at 706–07 ("[W]e predict that, despite the sentence in the *Arlington Heights* opinion, the Supreme Court would hold that [a corporation established to advance minority interests] has standing to assert claims of racial discrimination."); *Des Vergnes v. Seekonk Water Dist.*, 601 F.2d 9, 13, 14 (1st Cir. 1979) (holding that a corporation has standing to assert a § 1981 claim "against any other person who, with a racially discriminatory intent, injures him because he made contracts with non-whites.").

No. 19-10006

In so doing, the D.C. Circuit rejected the rationale of corporate racial identity: "Rather than assume that racial identity is a predicate to discriminatory harm, we might better approach the problem by assuming that, if a corporation can suffer harm from discrimination, it has standing to litigate that harm." *Id.* at 1568. The court continued:

> [A] party may suffer a legally cognizable injury from discrimination even where that party is not a member of a protected minority group. Thus, it is not necessary to determine whether CSI has a "racial identity." Such a query would lead to difficulties of determining what, in fact, constitutes a racial identity. For example, in the present case, CSI alleges that it has a racial identity because it is operated and owned by Mr. and Mrs. Gersman, who are both Jewish. Yet the situation would be no different if Gentile shareholders owned CSI and GHA ended the contractual relationship because the corporation had a single Jewish employee. Thus, CSI need not have a "Jewish identity," or even have predominantly Jewish owners or employees, in order to suffer injury from GHA's discriminatory actions.

*Id.* at 1569 (citations omitted). Because the court concluded that CSI's injury fell "within the zone of interests protected by" § 1981, it concluded that it "need not determine whether a corporation can in fact have a racial identity." *Id.*[3]

Methodist argues that *Gersman* conflicts with our decision in *Body By Cook* because *Body By Cook* requires a corporation to have a racial identity to assert a § 1981 discrimination claim. But *Body By Cook* contains no such language. We did not even discuss standing in that decision. *Body By Cook*, 869 F.3d at 386. We merely recognized, on review of a Rule 12(b)(6) dismissal, that the plaintiff corporation had adequately alleged that it was a racial

---

[3] The Tenth Circuit has adopted the D.C. Circuit's reasoning. *See Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.*, 295 F.3d 1065, 1072 (10th Cir. 2002) (holding that a corporation "has standing to assert discrimination claims under § 1981 . . . where such discrimination is based on the race of one of its employees").

minority for § 1981 purposes. *Id.* We never held that such racial identity was mandatory for corporate standing. *See id.*

Methodist also claims that *Gersman* is distinguishable because White Glove did not argue that Methodist terminated negotiations solely because of White Glove's affiliation with Clay. "In other words," Methodist argues, "the alleged discrimination was not directed towards White Glove, but towards Clay." But Methodist's argument is another variation on its proposed racial identity requirement. Reading *Gersman* to apply only when a corporation is "affiliated"—whatever that means—with a minority would mean that *Gersman* applies only when a corporation has racial minority status by proxy. The *Gersman* court explicitly rejected this result. 931 F.2d at 1568.

Methodist has not identified case law that explicitly requires a corporate racial identity for § 1981 standing. Nor has it proffered a compelling reason to reject *Gersman*'s persuasive reasoning. We hold that White Glove does not need a racial identity to have standing to assert a § 1981 racial discrimination claim.

We also conclude that White Glove has satisfied the Supreme Court's test for statutory standing set forth in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). A plaintiff has statutory standing under *Lexmark* if it "falls within the class of plaintiffs whom Congress has authorized to sue under" a substantive statute. *Id.* at 127–28, 128 n.4. When assessing standing under *Lexmark*, we look to (1) whether the plaintiff falls within the statute's "zone of interests" and (2) whether the plaintiff's alleged injuries were "proximately caused by violations of the statute." *Id.* at 129, 132. We address each inquiry in turn.

We first examine whether White Glove falls within the zone of interests that § 1981 protects. "Whether a plaintiff comes within the zone of interests is an issue that requires [courts] to determine, using traditional tools of statutory

No. 19-10006

interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 127 (internal quotation marks and citation omitted).   This test is "not especially demanding."   *Id.* at 130 (internal quotation marks and citation omitted).   It "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* (internal quotation marks and citation omitted).

To determine whether White Glove's claim satisfies the zone-of-interests test, we look to the operative statute.  Section 1981 states, "All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981; *see also Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 474–75 (2006) (stating that § 1981 "protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race." (quoting 42 U.S.C. § 1981)).

White Glove's claim satisfies the zone-of-interests test.  White Glove alleges that Methodist impinged on its right to contract because White Glove sent Clay, an African-American woman, to work in the Hospital's kitchen. Methodist argues that White Glove's claim falls outside § 1981's zone of interests because the alleged discrimination was against Clay, not White Glove itself.  But White Glove's claim is not "so marginally related to or inconsistent with the purposes implicit in [§ 1981] that it cannot reasonably be assumed that Congress authorized [White Glove] to sue." *See Lexmark*, 572 U.S. at 130 (internal quotation marks and citation omitted).  White Glove has satisfied the zone-of-interests test.

We next examine whether White Glove's claimed injuries were "proximately caused by violations of" § 1981.  *Lexmark*, 572 U.S. at 132.  As

9

an initial matter, Methodist challenges White Glove's proximate cause argument only in a footnote. "Arguments subordinated in a footnote are insufficiently addressed in the body of the brief, and thus are waived." *Arbuckle Mtn. Ranch of Tex., Inc. v. Chesapeake Energy Corp.*, 810 F.3d 335, 339 n.4 (5th Cir. 2016) (internal quotation marks and citation omitted). Methodist has waived its argument.

But even if Methodist had not waived the argument, White Glove has independently alleged proximate cause. Section 1981 prohibits racial discrimination in making and enforcing contracts. *See* 42 U.S.C § 1981. White Glove claims that Methodist terminated negotiations because White Glove sent Clay to work in the Hospital's kitchen. White Glove's alleged harm— termination of its prospective contract—has a "sufficiently close connection" to the alleged discrimination that § 1981 prohibits. *See Lexmark*, 572 U.S. at 132–33. Because White Glove has satisfied both prongs of the *Lexmark* inquiry, we hold that White Glove has statutory standing to assert a § 1981 racial discrimination claim. *See id.* at 129, 132.[4]

**B. Retaliation**

White Glove also appeals the district court's grant of summary judgment on its § 1981 retaliation claim. To assert a successful § 1981 retaliation claim, White Glove must show "(1) that [it] engaged in activities protected by § 1981; (2) that an adverse action followed; and (3) a causal connection between the protected activities and the adverse action." *Body by Cook*, 869 F.3d at 390. We conclude that no genuine factual dispute exists regarding whether White

---

[4] Methodist also argues that the third-party standing doctrine forecloses White Glove's claim. We disagree. The third-party standing doctrine generally prohibits a plaintiff from asserting claims based on a third party's legal rights. *See Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 80 (1978). But White Glove's discrimination claim is based on the direct harm that White Glove *itself* suffered when Methodist ended negotiations for allegedly discriminatory reasons. White Glove's claim is thus grounded in the alleged violation of its own legal rights.

Glove engaged in protected activities.  We thus affirm the district court's judgment.

Because the parties argued this case only under the Title VII standard for protected activity, we will assume *arguendo* that it applies in the § 1981 nonemployment context.  Under this standard, we examine whether White Glove purposively opposed Methodist's allegedly discriminatory conduct.  *See Thompson v. Somervell Cty.*, 431 F. App'x 338, 341 (5th Cir. 2011) (per curiam).

In arguing that it opposed Methodist's discriminatory behavior, White Glove points to the following evidence:

- White Glove sent Clay to work at Methodist even after learning that Soto preferred Hispanic workers.  White Glove again sent Clay back to work at Methodist three more times after Clay's first shift.

- After Jennings reiterated that Soto "wanted only Hispanics" and did not want "anybody else," Shawn said he would "do what [he could] to . . . put someone else in that spot," but noted that Clay was "already familiar with the kitchen."  Michael and Shawn then sent Clay back to the Hospital despite Soto's wishes because they could not find a "specifically Hispanic" person to fill the spot.

- When Jennings reaffirmed Methodist's demand for only Hispanic workers, Shawn told Jennings, "that's kind of messed up, I mean, for you to tell me that this is exactly all you're wanting.  I have a lot of people of all different backgrounds, so if you're needing someone else tomorrow . . . ."

- After Jennings indicated that Methodist was terminating negotiations due to Soto's displeasure at being sent a non-Hispanic worker, Linda responded, "That's a little hard to say out loud sometimes, isn't it, Jeff?"

It is true that Shawn and Linda made statements protesting Methodist's discriminatory actions.  But in the same conversations, both Linda and Shawn indicated that they would try to accommodate Methodist's demands.  Evidence that White Glove employees criticized Methodist's actions and sent Clay to

work in the Hospital, without more, does not create a factual dispute concerning whether White Glove purposively opposed Methodist's conduct. Because no genuine factual dispute exists regarding whether White Glove engaged in protected activity under Title VII, we affirm the district court's grant of summary judgment on White Glove's § 1981 retaliation claim.

## IV.    Conclusion

For the foregoing reasons, we REVERSE the district court's dismissal of White Glove's § 1981 racial discrimination claim, AFFIRM the district court's grant of summary judgment on White Glove's § 1981 retaliation claim, and REMAND the case for proceedings consistent with our opinion.