In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 23-1787

CIRCLE CITY BROADCASTING I, LLC,

*Plaintiff-Appellant,*

*v.*

AT&T SERVICES, INCORPORATED, AND DIRECTV, LLC,

*Defendants-Appellees.*

———————————

No. 23-1788

CIRCLE CITY BROADCASTING I, LLC,

*Plaintiff-Appellant,*

*v.*

DISH NETWORK LLC,

*Defendant-Appellee.*

———————————

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
Nos. 1:20-cv-02108 and 1:20-cv-00750 — **Tanya Walton Pratt**, *Chief Judge.*

———————————

ARGUED JANUARY 24, 2024 — DECIDED APRIL 16, 2024

———————————

Before WOOD, SCUDDER, and LEE, *Circuit Judges*.

SCUDDER, *Circuit Judge*. When DISH and DirecTV Network declined to pay broadcast fees to Circle City Broadcasting for rights to carry the company's two Indianapolis-based television stations, the dispute entered federal court. Circle City alleged that the decisions reflected discrimination against its majority owner, DuJuan McCoy, a Black man, and thus discrimination against the company itself. The district court entered summary judgment for DISH and DirecTV, concluding that Circle City failed to identify evidence permitting a jury to find that the decisions not to pay the broadcast fees reflected anything other than lawful business choices responsive to dynamics of the television broadcast market. We affirm.

## I

### A

A brief overview of the television broadcast market will help set the stage for our analysis of Circle City's claims.

Despite the revolutionary changes the internet has brought to television broadcasting, individual television stations continue to garner consumer demand and play a significant role. Some stations stand alone and operate independently (like Chicago's Very Own WGN9), while others are owned by a larger television network. Consider, for example, The Walt Disney Company, which is the majority owner of ESPN. The largest networks in the United States—ABC, CBS, NBC, and Fox—are known as "Big 4" networks.

Different still are television distributors, which bundle television stations and networks and sell the bundle to consumers. Popular today, and relevant to this case, are subscriber-based multichannel video programming distributors such as

DISH and DirecTV. The Federal Communications Commission requires these multichannel distributors to obtain the consent of networks or standalone stations before including their channels in a package for consumers. Multichannel distributors typically obtain this consent through the negotiation of so-called "retransmission consent agreements."

Retransmission agreements can be structured in different ways. Individual TV stations and networks typically take a cut of the revenue made from advertising. Sometimes multichannel distributors will also pay stations or networks a fee in exchange for the right to broadcast their content. Other times a station or network may consent to participation in a multichannel distributor's bundle without the payment of any fee because the advertising revenue is sufficiently lucrative. Stated another way, participation in a broader network can result in enhanced consumer exposure, which, in turn, can generate more advertising revenue for the network and its participant member stations.

This case is all about decisions by DISH and DirecTV to stop paying fees for the right to broadcast two television stations operating in Indianapolis, Indiana.

B

Circle City Broadcasting is a local television broadcasting network, structured as a limited liability company and operating in Indianapolis. Through another company, DuJuan McCoy owns a majority of Circle City and serves as President and Chief Executive Officer. Circle City itself owns two local Indianapolis television stations—WISH-TV and WNDY—which it purchased in September 2019 from Nexstar Broadcasting Inc., America's fifth largest television network.

Nexstar's decision to sell WISH and WNDY was driven by FCC regulations limiting the market share of major television networks. Prior to the sale, Nexstar had negotiated retransmission consent agreements permitting both DISH and DirecTV to offer WISH and WNDY to consumers in exchange for a fee. Put differently, the agreement allowed DISH and DirecTV, in exchange for a fee paid to Nexstar, to offer WISH and WNDY, among hundreds of other stations, to their subscribers. Those agreements expressly provided that they could be terminated if Nexstar sold WISH and WNDY. The DirecTV agreement—which Nexstar prepared with a potential sale of both stations in mind—even more specifically stated that DirecTV could terminate the contract upon sale to Circle City.

When Circle City purchased WISH and WNDY in September 2019, both DISH and DirecTV terminated their retransmission agreements with Nexstar. They asserted that they did so not to excise WISH and WNDY from the bundle of stations offered to their subscribers, but instead to eliminate what they saw as an avoidable operating expense while maintaining the local stations in their bundles. We say avoidable because of the changed market dynamic that occurred when Circle City became the new owner of WISH and WNDY.

Nexstar is among the largest TV networks in the country. And with its size comes bargaining power—leverage that Nexstar deployed when it owned WISH and WNDY among many other stations—to demand retransmission fees from DISH and DirecTV for the right to offer WISH and WNDY to their subscribers. But once Nexstar sold those stations, DISH and DirecTV declined to pay retransmission fees to Circle City. Why? Because they could: Circle City, unlike Nexstar,

did not own scores of networks and stations that it could use as leverage to extract a fee from DISH and DirecTV for the right to offer WISH and WNDY to subscribers. (For those familiar with antitrust law, this explanation will sound familiar, as it finds parallels in many a description of tying arrangements. See, *e.g.*, *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 461–67 (1992).)

How that outcome came to be is the centerpiece of the litigation Circle City commenced against DISH and DirecTV.

C

Upon acquiring WISH and WNDY from Nexstar, Circle City went to lengths to execute fee agreements with DISH and DirecTV.

### 1. Circle City's Negotiations and Litigation with DISH

To avoid losing WISH and WNDY in its subscriber package, a DISH representative emailed DuJuan McCoy in July 2019 with a proposed multi-year, no-fee retransmission consent agreement. When McCoy asked why DISH was offering Circle City lower rates than those available to Nexstar, the representative explained that "extremely large groups, like Nexstar, are able to extract money for stations that [multichannel distributors] would not pay for otherwise, simply by withholding consent for the stations [multichannel distributors] really do want until the [multichannel distributor] agrees to pay for the stations it does not want." DISH also told McCoy that this kind of no-fee agreement was the industry norm.

McCoy pushed back, sending a counteroffer to DISH in September 2019. Far from accepting the no-fee arrangement,

McCoy proposed fees higher than DISH paid Nexstar for WISH and WNDY. DISH's representative replied that the rates were "unprecedented" and observed that there was no way the company would pay Circle City the requested fee. Going further, DISH explained that paying a retransmission fee made little sense because both stations were on the brink of losing access to rights to broadcast Chicago Cubs baseball games at the end of the season. DISH then added that WISH's daily newscast was available for free on the internet.

McCoy did not relent. On November 26, 2019, he sent DISH his "last and final offer" for a fee-based retransmission agreement. DISH reacted much the same way, with its representative saying, "While I appreciate the offer, the rates you are proposing are not going to work for DISH. I can send you a markup of the draft, but if what you are proposing is a take it or leave it, then it may be a waste of time to send it." McCoy never requested a markup of the draft.

In March 2020 Circle City filed suit against DISH in federal court in Indianapolis. Invoking 42 U.S.C. § 1981, Circle City alleged that DISH discriminated against the company, a minority-owned business, by not agreeing to pay a fee for the right to offer WISH and WNDY to subscribers.

DISH moved for summary judgment on two grounds— one procedural and another substantive. First, DISH contended Circle City is not a proper plaintiff for purposes of § 1981 because the firm was organized as a limited liability company with multiple corporate members and therefore neither owned nor controlled by a single person who identified as a racial minority. Second, and on the merits, DISH argued that Circle City failed to produce evidence in discovery that

the company had been discriminated against in any way, including on the basis of McCoy's race.

The district court entered summary judgment for DISH. On the procedural point, the court concluded that Circle City had sufficiently alleged that it is a proper § 1981 plaintiff, emphasizing not only that McCoy owned almost 80% of the company but also that the company had registered with the state of Indiana as a minority owned business. Moving to the merits, the district court conducted a detailed examination of the evidence presented at summary judgment and concluded that Circle City failed to point to any facts that would allow a jury to find that DISH's conduct during the contractual negotiations reflected racial discrimination. To the contrary, the district court saw the evidence as permitting only one conclusion: DISH declined to pay fees for rights to broadcast WISH and WNDY because Circle City—unlike Nexstar—as the new owner of both stations lacked the market power to demand the fees.

### 2.      *Circle City's Negotiations and Litigation with DirecTV*

Circle City's negotiations with DirecTV traveled a similar course. In October 2019, as part of an effort to retain WISH and WNDY for its subscribers, DirecTV first offered Circle City a no-fee retransmission consent agreement—an arrangement it characterized as standard for "[s]tandalone, non-Big 4 Stations." Circle City declined the offer, with McCoy insisting that the company—like Nexstar—receive fees. In January 2020 DirecTV's representative sent McCoy an email reiterating that DirecTV's "policy is not to pay license fees for standalone non-Big 4 affiliated stations" like WISH and WNDY. McCoy was not having it, contending he knew

nothing about the purported policy. In time an impasse developed, with DirecTV maintaining that it had told McCoy all along about the company's no-fee policy. When the negotiations stalemated, DirecTV pulled WISH and WNDY from its station offerings. Circle City responded by heading to federal court with a second case.

Again invoking 42 U.S.C. § 1981, Circle City alleged that DirecTV, much like DISH, engaged in race discrimination by declining to pay retransmission fees. Finding itself as a plaintiff in two nearly identical cases, Circle City requested that the two actions proceed before the same district judge. See S.D. Ind. L.R. 40-1(d)(2)(A). The district court agreed.

Following discovery, the district court entered summary judgment for DirecTV, reasoning in much the way it did in the DISH case. The district court saw nothing in the record suggesting that McCoy's race played any role in DISH's decision not to pay fees to Circle City for rights to offer WISH and WNDY to subscribers. Here, too, the district court rejected the contention that DirecTV's explanation for its decision not to offer Circle City fees was a cover up for racial discrimination. In the end, the court determined that Nexstar's vast television holdings and the bargaining power that came with that size—rather than McCoy's race—drove the decision not to offer Circle City retransmission fees.

Circle City appealed both judgments entered by the district court. Because the two cases arise out of comparable facts and present similar issues on appeal, we have consolidated the cases for the purposes of our review and decision. See Fed. R. App. P. 3(b)(2).

## II

### A

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The Supreme Court has explained that the statute "offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

To succeed on its § 1981 claims, Circle City had to provide evidence of an "impaired contractual relationship" to which it had rights. See *id.* (internal quotation marks omitted). Circle City then bore the burden of proving that race was a but-for cause of its injury. See *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020) (interpreting § 1981 and explaining that the "plaintiff must demonstrate that, but for the defendant's [] conduct, its alleged injury would not have occurred"). Circle City can meet this burden by adhering to the same standards applied in intentional employment discrimination claims in Title VII cases. See *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013). This means that, the whole of Circle City's evidence must convince us that DISH or DirecTV would have offered Circle City retransmission fees were the company not a minority-owned business. See *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016).

B

DISH urges us to resolve this appeal by sidestepping the merits and holding that Circle City is not a proper plaintiff under § 1981. DISH understands Circle City's theory of liability—that racial discrimination allegedly occurred against DuJuan McCoy and, by extension, against the corporate entity itself—but it pushes back on the factual premise. By DISH's measure, Circle City's connection to McCoy is too indirect to make the company a proper § 1981 plaintiff, as the firm is itself owned by several corporate entities, only one of which is wholly owned by McCoy.

Recognize what DISH is and is not arguing. The company is not contending that we lack subject matter jurisdiction because Circle City lacks Article III standing. Rather, DISH contends that Circle City's claim—that the entity itself experienced discrimination—does not fall within § 1981's zone of interests on these facts. See *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) ("Whether a plaintiff comes within the 'zone of interests' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." (internal quotation marks omitted)).

We do not need to resolve the question. The law in this area is underdeveloped, and the fact pattern before us presents some confounding factors, including that Circle City was not a certified minority-owned corporation at the time the company filed suit and thus, by definition, not at the time of the discrimination alleged in its complaint. In these circumstances, the most prudent path forward is to assume without deciding that the district court was right to conclude that

Circle City fits within § 1981's protected zone of interests and to proceed to the merits of company's challenge to the entry of summary judgment for DISH and DirecTV. We have this flexibility when our subject matter jurisdiction is not in question. See *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 82, 89 (1998). Future cases are sure to provide opportunities to define § 1981's proper zone of interest with corporate plaintiffs.

C

Turning to the merits, our role as a court of review is to take our own independent look at the evidence presented at summary judgment and ask whether Circle City, as the non-moving party, identified facts that would have permitted a jury to find that DISH or DirecTV declined to offer it fees because of its minority-owned status. See *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 928 (7th Cir. 2020). Having done so, we believe the district court's analysis was spot on at every turn.

The district court saw Circle City's two cases as doomed by failures of proof. It reached these conclusions by rolling up its sleeves, scouring the evidence presented at summary judgment, and in the end seeing nothing directly or indirectly suggesting that DISH or DirecTV discriminated against Circle City based on its status as a minority-owned corporation or, relatedly, on the basis of McCoy's race. See *Ortiz.*, 834 F.3d at 765–66 (clarifying that the legal standard is whether the evidence considered as a whole, rather than sorted into "direct evidence" and "indirect evidence" piles, "would permit a reasonable factfinder to conclude that the plaintiff's race … caused the … adverse employment action").

We see the analysis the same way. Circle City had a theory of liability—that DISH and DirecTV declined to pay

retransmission fees because of McCoy's race. But the theory found no backing in evidence and instead rooted itself in conjecture. Speculation does not suffice to create a genuine issue of fact that defeats summary judgment. See *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016). Put most directly, we see nothing in the evidence presented at summary judgment allowing a finding that McCoy's race played any role in the negotiating approach or ultimate decisions of DISH or DirecTV.

For their part, DISH and DirecTV presented clear evidence of a race-neutral reason for their contractual negotiating decisions—Circle City's lack of bargaining power. That record showed that DISH and DirecTV paid Nexstar fees for stations like WISH and WNDY to ensure access to other channels owned by Nexstar for which there existed clear consumer demand. Circle City lacked comparable television channel holdings and thus the market power of a massive media company like Nexstar. DISH and DirecTV, in other words, had no business need to continue paying fees for access to the two local Indianapolis stations, WISH and WNDY, once the stations were under new ownership. We see nothing in the record pointing to any other possible conclusion.

We likewise agree with the district court that Circle City fell well short of demonstrating any pretext in DISH and DirecTV's explanations for choosing not to pay retransmission fees. See *Groves v. South Bend Cmty. Sch. Corp.*, 51 F.4th 766, 770 (7th Cir. 2022) (explaining that "identifying an inconsistency (or even a lie) is not necessarily sufficient to prove … pretext for discrimination" because "[w]hat ultimately matters is *causation*: the plaintiff must point to evidence that

would allow a jury to find a connection between the statutorily protected factor (here, race) and the adverse action").

Circle City devotes major portions of its briefs to trying to persuade us that DISH and DirecTV did not offer perfectly consistent explanations for declining to pay retransmission fees. And from there Circle City insists that the true explanation must be discrimination. But therein lies the flawed reasoning—no evidence supports the link between the company's contention and its conclusion. To survive summary judgment, Circle City needed to produce evidence permitting a finding that any pretextual explanations masked racial discrimination. See *id.* The district court could hardly have been more careful and thorough in its review of the evidence, and, on this point, it saw nothing pretextual about DISH and DirecTV's decisions. Nor do we.

For these reasons, we AFFIRM.